**WHITE MOUNTAIN APACHE TRIBE OF ARIZONA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 22–H.**

United States Claims Court.

Feb. 6, 1987.

William H. Veeder, Washington, D.C., for plaintiff; Robert C. Brauchli, Whiteriver, Ariz., of counsel.

Bernard M. Sisson, Washington, D.C., with whom were Harry H. Kelso and Asst. Atty. Gen. F. Henry Habicht II, for defendant.

## OPINION

NETTESHEIM, Judge.

### INTRODUCTION

Docket 22 began as a first amended petition filed in the Indian Claims Commission on October 18, 1950, by the White Mountain Apache Tribe of Arizona ("plaintiff") and another tribe that departed the litigation on January 19, 1981, after settlement of its claims. Suit was authorized by the Indian Claims Commission Act of August 13, 1946, Pub.L. No. 79–726, § 2, 60 Stat. 1049, 1050, *as amended*, 25 U.S.C. § 70a (1976) (omitted from Code pursuant to Commission termination on Sept. 30, 1978). On May 25, 1959, the Commission severed Docket 22 into a number of cases. A second amended petition was filed on October 27, 1959, as Docket 22–H asserting claims for mismanagement of tribal resources and for a general accounting. Plaintiff's ab-

original land claims were adjudicated as Docket 22–D in 1969. *San Carlos Apache Tribe v. United States*, 21 Ind.Cl.Comm. 189 (1969). Docket 22–H was transferred to the United States Court of Claims on December 15, 1976, pursuant to the Act of October 8, 1976, Pub.L. No. 94–465, 90 Stat. 1990, 25 U.S.C. § 70v (1976) (omitted from Code pursuant to Commission termination on Sept. 30, 1978), and then continued in the successor United States Claims Court. This opinion addresses all of plaintiff's claims in Docket 22–H for mismanagement of the water, rangeland, and timber on the Fort Apache Indian Reservation (the "reservation"). Plaintiff's claims for general and special accountings are proceeding separately.

The resource mismanagement claims were tried in September and October 1986, following a three-day site inspection on the reservation in early September. Since these claims were tried 27 years after the second amended petition was filed, and since the trial addressed many issues (all but a few lending themselves to explication by expert witnesses), identifying with some precision what the trial was about is important.

Over the years that this matter has been before the Indian Claims Commission, the Court of Claims, and this court, the parties have leveled charges of delay in adjudicating plaintiff's claims. In previous decades defendant may have been dilatory, as plaintiff charges, but during the four-year period that this court has presided over the case, the Government has met every court-imposed deadline. Whether or not plaintiff delayed trial, nevertheless, has no bearing on the merits of plaintiff's claims that are considered in this opinion.

Although the evidence adduced at trial described the relationship between plaintiff and the Bureau of Indian Affairs (the "BIA") of the Department of Interior, the wisdom *vel non* of the BIA's (and its predecessor entities') providing employment for many of plaintiff's members, managing the reservation's timber resources, and acting as the bureaucracy that controls much of

the federal funding to plaintiff, as well as expenditures of plaintiff's own funds, is a matter commended to the Congress. Judicial inquiry does not extend to the policy questions necessarily implicated by a trial of this nature, but is restricted by the Indian Claims Commission Act to deciding specified claims. 25 U.S.C. § 70a provided in pertinent part:

The Commission shall hear and determine the following claims against the United States on behalf of any Indian Tribe …: (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States were subject to suit; … (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity. No claim accruing after August 13, 1946, shall be considered by the Commission.

Plaintiff's theory of the case is that since the reservation was created, the Secretary of the Interior and his delegates have administered plaintiff's water, rangeland, and timber resources—in fact, the entire reservation—as a source of water for the downstream Salt River Federal Reclamation Project and not for the benefit of plaintiff. Although plaintiff characterized its cause of action as fraudulent mismanagement, the court determined to hold plaintiff to proof by a preponderance of evidence, not the more rigorous standard of clear and convincing evidence required for fraud. See Loesch v. United States, 227 Ct.Cl. 34, 55, 645 F.2d 905, 921, cert. denied, 454 U.S. 1051, 102 S.Ct. 618, 70 L.Ed.2d 604 (1981). Defendant's theory of the case is that there has been no mismanagement with respect to any of the three resources, and that at no time prior to August 13, 1946, did the Secretary of the Interior fraudulently mismanage the reservation for the benefit of downstream, non-Indian water users.

The source of the Government's duty is not the same for each of the three claims.

With respect to management of the reservation's forest, including the harvest and sale of plaintiff's timber, a comprehensive federal regulatory scheme defines the Government's duties. United States v. Mitchell, 463 U.S. 206, 224, 103 S.Ct. 2961, 2971, 77 L.Ed.2d 580 (1983); see White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980). In contrast, the Government's duties regarding the reservation's rangeland derive from the Secretary of Interior's control or supervision over grazing as a source of revenue to plaintiff. See Navajo Tribe of Indians v. United States, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980) (cited in United States v. Mitchell, 463 U.S. at 225, 103 S.Ct. at 2972). Any duty concerning water, too, must be based on an obligation imposed by law or gratuitously assumed by the Government to control or supervise plaintiff's water resources. Although plaintiff never identified its source, the court assumes that such a duty is based on the requirement that the Department of the Interior approve appropriations from Indian funds for irrigation projects.

■ The Supreme Court in Mitchell ruled that a claim for damages is implied from comprehensive regulation of Indian resources. It cited Navajo Tribe (a case under the Indian Claims Commission Act) for the companion proposition that a fiduciary duty is implied from the "elaborate control" of Indian property. Mitchell, 463 U.S. at 225, 103 S.Ct. at 2972. Under Mitchell, then, no fiduciary duty arises absent comprehensive regulation of Indian resources. A suit for damages for breach of fiduciary duty to act affirmatively does not arise independent of the linchpin treaty, statute, executive order, or regulation that charges the Government with specific duties to act. The statutes and regulations concerning forest management in Mitchell and the case at bar exemplify such affirmative duties.

Even though Mitchell was not a case arising under the Indian Claims Commission Act, the case defines this court's juris-

diction to consider plaintiff's claims. It is true that the jurisdictional grant of the Indian Claims Commission Act recognizes a cause of action based on fair and honorable dealings, but the relationship whereby the Government obligates itself to a tribe must derive from a treaty, statute, regulation, or executive order. *Sac & Fox Tribe v. United States*, 179 Ct.Cl. 8, 27, 383 F.2d 991, 1001, *cert. denied*, 389 U.S. 900, 88 S.Ct. 212, 19 L.Ed.2d 217 (1967); *Gila River Pima-Maricopa Indian Community v. United States*, 135 Ct.Cl. 180, 189, 140 F.Supp. 776, 780 (1956).

*Mitchell*, however, did not address the issue whether a claim for breach of fiduciary duty can be based on the Government's actions once it has undertaken within the exercise of only general powers over Indian affairs to control or supervise Indian property for the benefit of a tribe. *Navajo Tribe* is authority that a breach in this situation is actionable, such as the Government's instituting and supervising the grazing permit system on the reservation in this case, even though no statutory or regulatory scheme required the Government to generate income for the tribe from the rangeland. The record is unclear whether the Government's control over expenditures of Indian funds for irrigation projects was "elaborate." The Court of Claims also recognized a breach of duty apart from any elaborate control of a resource on an Indian reservation, another issue not addressed by *Mitchell*. For example, in this case, although the Government had no statutory or regulatory duty to develop irrigation facilities on the reservation, a failure to protect water resources can be actionable. *See Gila River Pima-Maricopa Indian Community v. United States*, 231 Ct.Cl. 193, 208, 684 F.2d 852, 861 (1982) (per curiam). The notion that the United States has a "special relationship" to protect the water resources based on establishing the reservation, enlarging it, and recognizing the need to protect the water supply established the Government's duty in that case.

A question exists whether after *Mitchell* the breaches of fiduciary duty not occurring within the context of an elaborate control of a given resource still can be recognized. The court deems that the prudent course is to decide the case tried before it, even though jurisdictional problems seem to lurk.

The volume and complexity of the evidence and the variation in the legal standards for different claims require that the facts and law be discussed individually with respect to each of the three resource claims. Further, plaintiff's claims that the reservation was fraudulently mismanaged for the production of water are discussed separately with respect to the rangeland and forest. Although no liability is found for plaintiff's claims for mismanagement of its water resources, sufficient findings and conclusions are stated on damages so that the record reflects an assessment of the evidence measured against the applicable legal standards. In considering all three resource claims, the court also addresses separately those claims arising both before the jurisdictional cutoff of the Indian Claims Commission Act on August 13, 1946, and thereafter in order to determine if a course of wrongful conduct occurring before August 13, 1946, continued after that date.[1]

The evidence admitted consists of testimony and documents either referred to during trial and not excluded or referred to in expert reports. That evidence discussed specifically in this opinion is deemed sufficient to support the finding in question. Some evidence not discussed is deemed cumulative of the evidence discussed. It

---

**1.** Having taken the position that no wrongful conduct continued after August 13, 1946, defendant only presented evidence against a finding that plaintiff had satisfied the jurisdictional threshold by adducing evidence that wrongful conduct began as of August 13, 1946, and continued thereafter. Defendant has not waived the provisions of the ¶ 10 of the February 7, 1984 order (*see* order entered on November 7, 1983, ¶ 6; order entered on May 7, 1984, ¶ 4; order entered on June 15, 1986), allowing it to put on its case against plaintiff's claims of continuing wrong at a later date.

should go without saying that mentioning every exhibit and all the points made by each witness would be impossible. Similarly, some exhibits and portions of testimony that involved lines of reasoning that did not assist the determination of the central issues of each claim also are left unmentioned.

Several general observations may be made. Because of the remoteness of the events occurring before 1946, most of the evidence came through the filter of interpretation by experts. Therefore, documentary evidence retrieved from archives and similar sources was deemed the most reliable insofar as it represents contemporaneous observations by percipient witnesses, who, in many cases, were government agents. As defendant argues, however, the analytical tools available today cast doubt on the veracity of what some of these witnesses observed and recorded as causative agents. Documentary evidence thus becomes determinative only when its sheer volume and consistency are probative that the observers during the late 1800's and early part of this century accurately reported what was happening on the reservation.

The court was privileged to make an on-site inspection of the reservation. This inspection was organized by counsel for both parties, each designating sites to be visited by helicopter or overland vehicle for one and one-half days. In addition, the court took a fixed-wing flight crisscrossing the entire reservation. The court's observations confirmed some reports made in old documents, assessed the present-day condition of the rangeland and timber resources, and gave vivid context to the Government's past timber harvesting and current forest management practices.

Finally, this is a case wherein the Government is willing to suffer a money judgment against an Indian tribe. Plaintiff has sued for $1.250 billion, and defendant admits liability for mismanagement of two forest fires in the amount of $10,400.

## BACKGROUND

The trust relationship that is central to this litigation commenced in 1872 when plaintiff, along with the San Carlos Apache Tribe, was placed on the White Mountain Apache Indian Reservation in east central Arizona by executive orders issued between November 9, 1871, and July 21, 1874. This original reservation was administered by the San Carlos Agency located 90 miles from the United States Army Camp at Fort Apache. For ease of administration, both plaintiff and the San Carlos tribe were moved near the San Carlos Agency. When this policy proved unworkable, the members of plaintiff tribe moved back to Fort Apache, where they were supervised by the United States Army camp located there. In 1897 the original White Mountain Apache Indian Reservation, comprising over 2.5 million acres, was divided into the Fort Apache and San Carlos Indian Reservations. Act of June 7, 1897, ch. 2, 30 Stat. 62, 64.

Plaintiff's reservation contains over 1,664,000 acres, or approximately 2,602 square miles, located northeast of Phoenix, in an area of forests and rocky hills. The reservation is heavily forested, with more than 685,000 acres of commercial forests. The distance between the north and south boundaries is 30 to 40 miles. The reservation extends approximately 75 miles east to west along the Mongollon Rim, its northern boundary. On the north the reservation is bounded by the Sitgreaves and Apache National Forests, on the west by the Tonto National Forest, on the east by the Apache National Forest, and on the south by the Tonto National Forest and the San Carlos Indian Reservation. An area of dramatic topographical contrasts, the reservation has lush forests and plains marked by shallow to deep arroyos, or gullies. Although rich in natural resources, the reservation did not offer an easy living to plaintiff.

Attributed to the 1898 Annual Report of the Commissioner of Indian Affairs by one of defendant's experts was the following statement:

"When it is remembered these Indians were placed on this reservation with absolutely nothing—the most hated of all the western Indians, kept strictly within the limits of their reservation, with no market but the army post, and what they now have is the result of their own labor, and considering the obstacles they had to overcome in this mountainous country—little as it seems, they have done exceedingly well."

If the mountains and forests are the most striking physical features of the reservation, plaintiff would regard as its paramount resource the Salt River. "Practically the entire Reservation drains to the Salt River ...," observed the June 1, 1944 "Post-War Program" for the reservation.[2] Prior to 1872 when they were placed on the White Mountain Apache Indian Reservation, the Indians comprising plaintiff tribe had been nomads, with a history of agriculture, growing corn, wheat, beans, and vegetables, which they continued growing on the reservation by irrigating with diversion dams and ditches small areas of benchland along the streams. Plaintiff had an established history of agriculture. The Indian Claims Commission found that the tribes comprising the Western Apache, which in-

cluded other nearby tribes, satisfied an estimated 25 percent of their diet by the crops they grew. *San Carlos Apache Tribe v. United States*, 21 Ind.Cl.Comm. at 208. Because the reservation was a long distance from commercial centers, the markets for plaintiff's produce after the reservation was established were limited.[3] As the game that plaintiff hunted became scarce, government rationing became important to plaintiff's survival, and, as will be discussed, the Indian agents on the reservation looked toward development of other resources for producing income for the tribe.

## DISCUSSION

### I. Claims for mismanagement of plaintiff's water resources

According to Dr. Charles E. Brockway, defendant's expert hydrologist and engineering economist, a watershed is defined as the topographic area from which water on the surface flows towards a central stream. The watershed of the Salt River encompasses principally the Verde, White, and Black Rivers. The Verde River itself is not on the reservation.

**2.** The remainder of the quoted sentence reads: "and it is therefore an important source of water supply for the Roosevelt Reservoir and Salt River·Valley...." This subject is explored fully in part I of this opinion.

**3.** The Annual Reports were prepared yearly by the United States Indian Agents or Superintend-

ents of the BIA's predecessor entities on the reservation. Before 1920 only the Annual Report for 1917 describes the markets for agricultural produce as other than limited.

GILA – SALT – VERDE RIVER SYSTEM
EASTERN – CENTRAL ARIZONA
PRINCIPAL RIVERS, TRIBUTARIES
STORAGE, AND DIVERSION FACILITIES

The Black River forms the southeastern boundary of the reservation from the far east and joins the White River which flows from the northeast through the reservation to form the Salt River, which is the southern border of the reservation. From that point the Salt River flows west. Tributaries to the Salt River are creeks within the reservation, including the Cedar, Carrizo, Cibecue, and Canyon Creeks.

Southwest of the reservation a series of structures regulates and stores the flows of the Salt and Verde Rivers. Downstream of the reservation on the Salt River are the Roosevelt Dam and Reservoir; Horse Mesa Dam and Apache Lake; Mormon Flat Dam and Canyon Lake; and Stewart Mountain Dam and Saquaro Lake. These structures were constructed from 1905 to 1930 as the Salt River Federal Reclamation Project and utilize all the natural and surplus flow of the Salt River coming off the reservation that has not been appropriated and used upstream. The Verde River runs through the Bartlett and Horseshoe Dams and their corresponding reservoirs.

Roosevelt Dam, the earliest of these structures, is the primary storage facility for the Salt River Federal Reclamation Project. After passing through the dams with their corresponding power plants and lakes, the Salt River meets the Verde River above the Granite Reef Diversion Dam, also part of the Salt River Federal Reclamation Project. Irrigation canals sprout on either side of the Granite Relief Diversion Dam. South of Phoenix the Salt River joins the Gila River, which runs west into the Colorado River system. In addition to the Salt River Federal Reclamation Project, the Central Arizona Project brings water from the Colorado River into the greater Phoenix area above the Granite Reef Diversion Dam.

The combined storage capacity of the Roosevelt, Horse Mesa, Mormon Flat, and Stewart Mountain Dams, is 1,755,000 acre feet. The Verde River generates total storage capacity in the Horseshoe and Bartlett Dams of 317,700 acre feet. The contribution of the Salt River to the water

storage and distribution project that bears its name is undisputed. From this premise, however, plaintiff infers that the Secretary of the Interior and his delegates (the "Government") have manipulated the Salt River on the reservation for the benefit of downstream users, consisting of the Salt River Federal Reclamation Project itself and all the agricultural and domestic users in the metropolitan areas southwest of the reservation. Plaintiff's principal evidentiary support for this contention was marshaled by its expert Thomas M. Watson, a civil engineer and hydrologist. Plaintiff also relied on hydrologist Charles P. Corke, a BIA employee since 1954, who has served as Deputy Assistant Commissioner of the Division of Economic Development, with portfolio of Assistant Commissioner, and who once chaired an Indian Irrigation Task Force. Mr. Corke testified as a percipient witness who was familiar with the hydrology of the reservation, the BIA's policies with respect to development of irrigation, and the quantity of irrigated acreage on the reservation.

Defendant countered with the expert testimony of Dr. Brockway; Dr. Joel R. Hamilton, an agricultural economist; and Dr. Edward M. Angel, a historian. Mr. Watson and Dr. Brockway may be regarded as opposing experts; they are both civil engineers with backgrounds in hydrology. Dr. Hamilton's principal contribution was presenting and analyzing historical documents. This was the sole focus of Dr. Angel's testimony.

If liability had turned on expert analysis of the hydrology of the reservation and its potential for development, which it emphatically does not, Dr. Brockway exhibited more extensive and in-depth experience than Mr. Watson in feasibility and evaluation analyses of water supply and distribution projects. As a tenured research professor who serves as an agricultural engineering specialist at the University of Idaho, not surprisingly Dr. Brockway also has published more in the field than Mr. Watson. Plaintiff indeed is fortunate to have an advisor as talented and committed as Mr. Watson, who has participated in developing irrigation projects on the reservation. He exhibited an impressive command of the evidence in testifying with respect to all three major resources. However, Dr. Brockway brought superior qualifications and more experience in the field to bear.

The gravamen of plaintiff's claim for mismanagement of water resources is that the Government restricted the tribe to the irrigation facilities developed by the BIA before the turn of the century. According to plaintiff, the Government thereby thwarted or suppressed development of irrigation facilities for the reservation's practicably irrigable acreage. These actions were taken, plaintiff charges, to manage the reservation solely for the benefit of downstream users. So single-minded was the Government's purpose of enhancing water flow off the reservation to benefit downstream users, that the Government managed the tribe's rangeland and forest resources to this end, in plaintiff's view.

## A. *Liability* (pre–1946)

1. A recapitulation of some of the procedural history of this case shows why for the most part plaintiff's liability theories must be rejected as legally irrelevant. The amended petition that gave rise to this litigation did not identify a claim for mismanagement of plaintiff's water resources in other but the most general terms. *White Mountain Apache Tribe v. United States*, 8 Cl.Ct. 677, 679 (1985) (order granting and denying motion to dismiss). When, in response to answers to interrogatories, plaintiff revealed that it was making a claim that the Government was obligated to develop all the practicably irrigable acreage on the reservation, defendant moved to dismiss the claim. *See White Mountain Apache Tribe*, 8 Cl.Ct. at 680–81 (quoting interrogatories and responses). The claim was dismissed, although plaintiff was allowed to pursue companion claims that the Government had suppressed its water rights or excessively appropriated water for the benefit of downstream users:

Plaintiff's contention that defendant is liable for neglecting to develop "all the

potentially (or practicably) irrigable acreage" on the Fort Apache Reservation fails to state a claim upon which relief may be granted. *Gila River Pima-Maricopa Indian Community v. United States*, 231 Ct.Cl. at 213–14, 684 F.2d at 865, holds that the United States has no obligation to construct irrigation facilities for the Indians. Plaintiff's claim, however, is dismissed only to the extent that damages are sought concerning a development obligation. Any claim alleging that the Government diverted, prevented, or neglected to supply water for irrigation remains viable and shall be adjudicated under plaintiff's claims concerning water resources or suppression of *Winters* Doctrine rights.

*White Mountain Apache Tribe*, 8 Cl.Ct. at 684. The exact nature of the claims remaining in litigation was still unclear. *See id.* A motion for reconsideration of the one claim dismissed was denied. *White Mountain Apache Tribe v. United States*, 9 Cl.Ct. 32, 33 (1985) (order denying motion for reconsideration).

The motion to dismiss had been granted on September 4, 1985, and the motion for reconsideration was denied on October 9, 1985. After plaintiff had filed its expert reports on its claim for mismanagement of water resources on January 18, 1986, defendant ascertained that, notwithstanding the September and October 1985 rulings, plaintiff would seek to prove damages based on the failure to develop irrigation facilities for all acreage on the reservation that, as of 1986, could be irrigated by existing technology. Damages were also predicated on the value to downstream users of water coming off the reservation by means of the Salt River. Defendant then moved *in limine* asking that the damage claims be rejected out of hand in advance of trial. This court refused to do because defendant was challenging plaintiff's liability case more than its theories for damages. *White Mountain Apache Tribe v. United States*, 10 Cl.Ct. 115, 120 (1986) (order granting and denying motion *in limine*). However, the court cautioned that plaintiff's theory of liability was likely to fail

based on entrenched legal principles, now once again explicated in this opinion.

Seminal to plaintiff's water resource claim, but beyond this court's jurisdiction to quantify, are Winters Doctrine rights. The Winters Doctrine derives from the Supreme Court's decision in *Winters v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). When the Fort Belknap Indian Reservation was created by treaty, no provision reserved to the Gross Ventre Indians the water in the Milk River or its tributaries riparian to the reservation. Settlers and other riparian owners attempted to appropriate waters of the river under state law once Montana was admitted into the union by statute. The Winters Doctrine was articulated during the halcyon days when the Supreme Court spoke through one opinion joined in by all justices save one, who merely noted his dissent. The Court held that the Indians through treaty did not implicitly give up the means of irrigation. Prior to the treaty the Indians "had command of the lands and the waters—command of all their beneficial use, whether for hunting, 'and grazing roving herds of stock,' or turned to agriculture and the arts of civilization." *Id.* at 576, 28 S.Ct. at 211. The agreement impliedly intended to reserve the waters of the river for "use which would be necessarily continued through years," *id.* at 577, 28 S.Ct. at 211, consistent with the purposes of the treaty: The reservation was formed to change the "nomadic and uncivilized" habits of the tribe and make them into "a pastoral and civilized people," *id.* at 576, 28 S.Ct. at 211; without water to irrigate the lands, the reservation would be "practically valueless," and " 'civilized communities could not be established thereon,' " *id.*; and, absent the acknowledgement of reserved water rights, the purpose of the agreement would thus be impaired or defeated. *Id.* at 577, 28 S.Ct. at 211; *accord United States v. Powers*, 305 U.S. 527, 533, 59 S.Ct. 344, 346, 83 L.Ed. 330 (1939).

The power of the Federal Government to reserve the waters and exempt them from appropriation under the laws of Montana

was upheld over rights allegedly derivative of the statehood statute, but the Supreme Court in *Winters* did not attempt to quantify the amount of reserved water. The Ninth Circuit, responsible for the decision that was reviewed by the Supreme Court in *Winters v. U.S.*, 143 F. 740 (9th Cir.1906), took the initiative. *Conrad Investment Co. v. United States*, 161 F. 829, 832 (9th Cir.1908), equated the Winters Doctrine rights to an amount of water "reasonably necessary, not only for present uses, but for future requirements." Almost 60 years later, the Supreme Court announced the standard for measuring reserved water rights. In *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), the Court upheld a special master's finding made in an allocation of rights to the Colorado River among various claimants, including five Indian reservations in Arizona, California, and Nevada, represented by the Federal Government. He found that

> the water was intended to satisfy the future as well as the present needs of the Indian Reservations, ... [ruling] that enough water was reserved to irrigate all the practicably irrigable acreage on the reservations....

373 U.S. at 600, 83 S.Ct. at 1497. Rejecting the notion that the Winters Doctrine rights should be based on a tribe's population, the Court concluded "that the only feasible and fair way by which reserved water for the reservation could be measured is irrigable acreage." *Id.* at 601, 83 S.Ct. at 1498.

The term "practicably irrigable acreage" is now recognized as the quantification of a tribe's Winters Doctrine rights. However, more recent Supreme Court decisions manifest a restrictive interpretation of that measure. *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), stated that *Winters* had held that a reservation of water rights sufficient to accomplish the purpose of the reservation is made when the Government reserves land for a reservation or other federal enclave. *Cappaert* went on to state boldly: "The implied-reservation-of-water rights doctrine, ... reserves only that amount of water necessary to fulfill the purpose of

the reservation, no more." 426 U.S. at 141, 96 S.Ct. at 2070 (citing *Arizona v. California*, 373 U.S. at 600–01, 83 S.Ct. at 1497–98). The law is now settled that "Congress reserved 'only that amount of water necessary to fulfill the purpose of the reservation, no more.'" *United States v. Mexico*, 438 U.S. 696, 700, 98 S.Ct. 3012, 3014, 57 L.Ed.2d 1052 (1978) (quoting *Cappaert* and *Arizona v. California*). The Supreme Court in *United States v. New Mexico* ventured a step further:

> Each time this Court has applied the "implied-reservation-of-water doctrine," it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purpose of the reservation would be *entirely defeated.*

438 U.S. at 700, 98 S.Ct. at 3014 (emphasis added).

In the later case of *Arizona v. California*, 460 U.S. 605, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983), the extent of the reservation of water rights was described as "an allotment of water necessary to" 'make the reservation liveable.'" 460 U.S. at 616, 103 S.Ct. at 1389 (quoting *Arizona v. California*, 373 U.S. at 599–600, 83 S.Ct. at 1497). The Court took occasion to emphasize that measuring reserved water rights must be a "*fixed* calculation of future water needs." 460 U.S. at 617, 103 S.Ct. at 1390 (emphasis in original).

This case involves the Winters Doctrine only insofar as plaintiff asserts that BIA officials attempted to frustrate any realization of plaintiff's Winters Doctrine rights. However, this is not a Winters Doctrine rights case insofar as the Claims Court lacks jurisdiction to adjudicate claims over plaintiff's reserved water rights in terms of the right to future use. That question is being litigated in Arizona state court. *In re: General Adjudication of All Rights To Use Water in the Gila River System and Source*, Nos. W–1—W–4 (Maricopa Co. Super.Ct., filed June 11, 1979). In contrast, the purpose of the trial in this court was to determine whether the Government divert-

ed or suppressed plaintiff's use of water on the reservation for irrigation purposes prior to August 13, 1946. *See Gila River Pima-Maricopa Indian Community*, 231 Ct.Cl. at 213 n. 11, 684 F.2d at 864 n. 11 (case "primarily concerned with future water use ... plainly involves different considerations").

As plaintiff was made aware by this court's rulings before trial dealing with plaintiff's water rights claims, the Indian Claims Commission Act, as interpreted by the Court of Claims, limits inquiry to the amount of water plaintiff could have diverted for irrigation, but did not, either because the Government suppressed the tribe's diversion of water or because the Government directed or permitted diversion of water by others. *Gila River Pima-Maricopa Indian Community v. United States*, 231 Ct.Cl. at 209, 213–14, 684 F.2d at 862, 865. The Court of Claims said:

Except as necessary to comport with the standard of fair and honorable dealings with the Pimas and Maricopas, by either protecting their existing water supply or providing an equivalent alternative supply, the United States had no obligation to construct irrigation works for these Indians. *American Indians Residing on the Maricopa-Ak Chin Indian Reservation v. United States*, 31 Ind.Cl. Comm. 384 (1973); *but see* Pub.L. No. 95–328, 92 Stat. 409....

....

... But even if *Winters* applies fully to plaintiffs, we hold that, for monetary compensation on account of pre-August 1946 injuries under the Indian Claims Commission Act, these Indians are not entitled to damages for the failure of the defendant to supply them with all the water necessary to irrigate all the practicably irrigable acres of their reservation. The reason is that, as we have found, (a) the Indians were not in fact using more than 7,000 to 8,000 acres even when they had the full natural flow of the Gila River, and (b) they did not have the ability (*i.e.* capital) to build the facilities necessary for greater irrigation or to control the Gila River flow—in other words, they

were unable to use more water than enough to cultivate 7,000—8,000 acres. The Indian Claims Commission Act, the aim of which was to grant monetary compensation for past (pre-August 1946) wrongs actually inflicted by the United States, *does not call for damages based on theoretical maximum 'rights' that the Indians were wholly unable to utilize and to implement at that time,* especially where the Government was under no moral or legal obligation to construct new facilities so that the Indians could then use the greater amount of water they now claim.

(Footnotes omitted; emphasis added.)

For purposes of this litigation, therefore, the concept of "practicably irrigable acreage" is relevant in the most limited sense, *i.e.,* to define that amount of acreage that would have been irrigated by plaintiff had the Government allegedly not acted wrongfully by suppressing plaintiff's use of water on the reservation or by diverting for its own or others' use or permitting others to divert those waters. Plaintiff's proof, through Mr. Watson, that 49,808 acres of the reservation are practicably irrigable using today's sprinkler technology and high-lift pumps, which admittedly were not in use prior to August 13, 1946, is irrelevant. Plaintiff offered no evidence that the Government suppressed the use or development of irrigation facilities for that amount of acreage, or diverted water that was being applied on that amount of acreage for its own or others' use, or permitted others to divert water used for irrigating 49,808 acres. The theoretical underpinning of plaintiff's claim, which must be rejected, is that because the Salt River's flow below the reservation benefited the Salt River Federal Reclamation Project, it can be inferred that the Government diverted water wrongfully from the reservation. Instead, the issue that this court can consider was framed correctly in plaintiff's October 28, 1983 answers to interrogatories—whether the Government suppressed plaintiff's water uses on the reservation.

Plaintiff cited no legal authority or introduced any evidence to identify the source or nature of the Government's fiduciary duty with respect to the water resources of the tribe. *Winters* and its progeny impose no duty to advise Indian tribes about their water rights. The 1982 Court of Claims decision in *Gila River Pima-Maricopa Indian Community* denies any duty apart from treaty, statute, or agreement—none of which is present here—to develop irrigation facilities. *See American Indians Residing on the Maricopa Ak-Chin Indian Reservation v. United States*, 31 Ind.Cl. Comm. 384, 392–93 (1973). There was mention in the old documents that the appropriations from tribal funds for irrigation projects required the approval of the Secretary of the Interior. This control of Indian funds would seem to satisfy the Supreme Court's requirement in *Mitchell* that a duty be based upon control of tribal monies or property. *See Mitchell*, 463 U.S. at 225, 103 S.Ct. at 2972.

■ The distinction between a duty to develop irrigation facilities and a duty not to discourage development is attenuated. Even though the Government has no developmental obligation, the failure to encourage plaintiff to undertake irrigation projects with its own resources may be culpable if irrigation projects were technically and economically feasible. *See Gila River Pima-Maricopa Indian Community*, 231 Ct.Cl. at 210, 684 F.2d at 863. This presumes that the Government was charged with the duty to test the technical and economic feasibility of such projects, but not to implement them with federal funds. As will be discussed, the BIA did investigate irrigation projects on the reservation and sought funding from the Government to supplement tribal funding.

2. Congress passed the Reclamation Act of 1902, Pub.L. No. 161, 32 Stat. 388 (1902) (the "Act"), to reclaim lands in the west through irrigation projects. Monies from the sale of lands in the arid states were to be used as a reclamation fund for the construction and maintenance of irrigation works. The Roosevelt Dam and Reservoir were among the projects authorized by the Act, reposing power for its administration in the Secretary of the Interior. Typically, irrigation projects under the Act, such as Roosevelt Dam and Reservoir, and the other networks built downstream of it, were and are subsidized by power generation plants, although the construction initially was funded by congressional appropriations. The Secretary of the Interior wears two hats in fulfilling his obligations (1) through the BIA for the trust responsibilities of the United States to Indians, *Poafpybitty v. Skelly Royal Co.*, 390 U.S. 365, 374, 88 S.Ct. 982, 986, 19 L.Ed.2d 1238 (1968), and his obligations (2) as administrator of activities authorized by the Act. The Supreme Court in *Nevada v. United States*, 463 U.S. 110, 128, 103 S.Ct. 2906, 2917, 77 L.Ed.2d 509 (1983), rejected the notion that the Secretary simultaneously could not perform both obligations without comprising his obligations pursuant to the Winters Doctrine in representing in court an Indian tribe's claim for reserved water rights.

Under the Act the Secretary administers the irrigation projects by contracting with a local association of landowners that takes over a project after it has been completed. The Salt River Valley Water Users' Association (the "SRVWUA"), incorporated in 1903, is the entity managing the Salt River Federal Reclamation Project under contract with the Department of the Interior since 1907 and for the benefit of whose shareholders the project was developed. As plaintiff aptly charges, the SRVWUA has been voracious for every drop of water that comes off the reservation. In fact, the day after the United States Court of Appeals for the Ninth Circuit issued its decision on February 5, 1906, in *Winters* recognizing reserved water rights, the SRVWUA filed a notice of appropriation of water for all surplus and flood waters in the Salt River. The United States, through the United States Geological Survey of the Department of the Interior, filed an identical notice on the same day. These claims amounted to all the water in the river coming off the reservation, since the natural

flow of the Salt River had been appropriated by prior downstream landowners. Indeed, the study of water storage potential undertaken by Arthur Powell Davis of the United States Geological Survey in 1903 before construction began on the Roosevelt Dam postulated that no upstream diversions would diminish the flow into the reservoir. These notices of appropriation did not negate, however, the notion that the Roosevelt Dam was "to store in the reservoir the surplus water in the Salt river over and above the normal flow of the river appropriated and used." *Hurley v. Abbott,* No. 4564, slip op. at 7 (Ariz.Terr.Ct.1910) (cited to slip op. admitted as PX I–35). Thus, later judicial declaration of upstream appropriations consistent with the Winters Doctrine was not preempted by the facts that downstream users had claimed all the natural flow or that the dam was designed to take all the flow the Salt River could give it.

After its storage capacity had been enlarged to account for sediment coming in from the Salt River, the Roosevelt Dam finally was closed in 1911. The Horse Mesa, Mormon Flat, and Stewart Mountain Dams were constructed through 1930. The Bartlett and Horseshoe Dams and Reservoirs on the Verde River were added in 1939 and 1945, respectively.

The Salt Water River Federal Reclamation Project came under scathing indictment in 1913, when the Reclamation Service, which succeeded to the United States Geological Survey's responsibilities under the Act, was cited for incompetence and maladministration, especially regarding balancing the interests of the tribes on the Gila River reservation in favor of land speculators. *See* Report on the Investigation of the Salt and Gila Rivers—Reservations and Reclamation Service, H.R.Rep. No. 1506, 62d Cong., 3d Sess. 6 (1913). Not only did the congressional investigation conclude that "Indian interests have been most outrageously intermingled with the affairs of the Reclamation Service....," *id.* at 3, but that "[i]f actual fraud does not exist, it can at least be said that many of the badges of fraud are evident [in the transactions examined].... " *Id.* at 17. The report even chastizes the decision to construct the Roosevelt Dam in the first place as not the optimum site for existing landowners, including Indians. The cost of construction of the Roosevelt Dam was deemed profligate and exclusively beneficial to the SRVWUA, which was created and began asserting its interests prior to the time when the Act provided for turning the project over to a landowners' association. *See id.* at 8–11.

Although this early history is bleak and was cause for ousting the governmental officials involved, the fact is that the wrongs were inflicted not only on Indian tribes other than plaintiff, but on non-Indian original farmers who were not speculators. *See id.* at 12. In other words, the actions, culpable as they were, were not directed to benefit downstream landowners at the expense of an Indian tribe, but benefited certain non-Indian interests at the expense of both non-Indian farmers and Indian tribes. Moreover, neither plaintiff nor the reservation was involved.

It was not until 1979, when the W–1 litigation commenced, that the Secretary of the Interior went to court to adjudicate plaintiff's water rights.[4] Because Arizona is an appropriation state in which claims for water are recognized by priority, not proximity to the flow of water as in riparian states, rights to waters of the Salt River must be determined judicially. The waters of the Salt River below what is now Granite Reef Diversion Dam are distributed pursuant to the "Kent Decree" entered in *Hurley v. Abbott.* Plaintiff was not involved in that proceeding, which, in any event, did not adjudicate water rights to the Salt River as it flows through the reservation. The reserved water rights of In-

---

**4.** *White Mountain Apache Tribe v. Hodell,* 784 F.2d 921, 922 (9th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 644, 93 L.Ed.2d 700 (1986), in discussing the background of the W–1 proceedings, explains that until 1976 the joinder of the United States in state court litigation was clouded by statehood enabling acts and general federal Indian policy.

dians holding allotted land, however, on the Salt River Reservation and Camp McDowell Indian Reservation were adjudicated by the Kent Decree. In the 1910 opinion accompanying the decree, Chief Judge Kent described the purpose · of the Roosevelt and Granite Reef Diversion Dams:

> By contracts between the Government and the members of the water users association, the latter will be entitled to receive for their land their proportionate share of the surplus water that may be stored by the Government in its impounding reservoir....

Slip op. at 7–8.

The Kent Decree determined the rights appurtenant to the parcels of land and the rights of their owners to water under the constraint that only completed appropriations could be recognized. Thus, a landowner actually must have diverted water and placed it to a beneficial use upon the land: "The right given by such an appropriation is strictly not a right to the water itself, but a right to the use of the water...." *Id.* at 8. A mere declaration of intention to appropriate would not suffice.

Plaintiff argues that although the Kent Decree was issued after the *Winters* decision,[5] no determination was made of the Indians' reserved water rights. This is not an accurate characterization of the proceeding. The Federal Government intervened in the proceeding "as guardian of a number of Indian settlers." *Id.* The rights of a tribe were not adjudicated, and Winters Doctrine rights are not individual. However, the Kent Decree acknowledged the prior right over all other appropriators (due to longevity of prior use) of the Indians on the Salt River Reservation. The Indians were allotted 500 miners' inches, but Judge Kent increased the entitlement to 700 because the lesser amount was insufficient to irrigate. *Id.* at 19. Also considered was the inability of the Indians on the Camp McDowell Reservation to divert an amount

necessary for the proper irrigation of their land. *See id.* at 20. Chief Judge Kent further reserved jurisdiction to adjust the duty of water (that amount necessary for the successful and economical cultivation of the land) as conditions may require. *Id.* at 11.

Plaintiff next contends that the Kent Decree effectively abrogated plaintiff's Winters Doctrine rights because rights to all the flow of the Salt River had been adjudicated. To the contrary, the Kent Decree by its terms decided claims of landowners below the Granite Reef Diversion Dam. More significantly, however, Judge Kent considered only completed appropriations. The Kent Decree has not prevented plaintiff, as an upstream beneficial landowner, from initiating, let alone completing, an appropriation of the Salt River waters.

3. The court's inquiry focuses on those acts by Government representatives that could constitute frustration or suppression of irrigation projects once they had been recommended for development by the Government. Underscored is the legal principle that the Government had no duty to develop irrigation facilities or construct them with its own funds. The "Post War Program" of June 1, 1944, says that the first canals reported were constructed in 1874. Thereafter, the Indians took out "numerous canals ... generally with some government assistance." Dr. Hamilton concedes in his report that, until after the turn of the century, "[m]uch of the early construction of irrigation facilities was due primarily to Indian initiative, with a minimal amount of government encouragement and support...." The evidence did not reveal any later instances of plaintiff's (or individual Indians') proposing the expansion of irrigation facilities (which is not surprising because the Government during this epoch was furnishing technical expertise). However, no evidence was introduced to support the inference that the tribe was prevented from taking the initia-

---

**5.** The evidence was taken for two and one-half years ending in 1909, the year after the *Winters* decision issued.

tive to develop and finance such projects, although Government approval was required for outlays from tribal funds. Thus, the scenario to be examined is what happened after the Government considered irrigation projects.

The documents that describe events that took place 60–80 years ago primarily were introduced through the testimony of Dr. Hamilton, as corroborated and supplemented by documents referred to by other expert witnesses, including Mr. Watson and Dr. Angel. Although plaintiff asserts that in the early 1900's agriculture would have flourished on the reservation with adequate irrigation, the documentary evidence strongly supports a finding that its prospects were limited. Agriculture traditionally had been practiced by the Indians of both plaintiff and the San Carlos Indian Tribe before the reservation was established. As of 1898, the year after the Fort Apache Indian Reservation was created, approximately 1,230 acres were irrigated along the streams by diversion dams and ditches. The principal market for the alfalfa, corn, and wheat raised by individual Indians was the United States Army post; other commercial markets were many miles distant over the mountainous terrain. *See supra* note 3 and accompanying text. The farming skills of the Indians were rudimentary and their practices unconventional, *e.g.*, custom dictated that after the death of an Indian who farmed a plot of land, it would be left to lie fallow for several years. The elements also conspired against the irrigation structures that had been constructed when torrential rains repeatedly wrecked the ditches and dams.

Annual Reports were prepared for the Commissioner of Indian Affairs by the various United States Indian Agents or Superintendents of the BIA and its predecessor entities at the Fort Apache Indian Agency and forwarded by the Commissioner to the Secretary of the Interior. *See also supra* note 3. In the Annual Report for 1898, Indian Agent Charles D. Keyes reported that the Indians needed assistance in building irrigation ditches to water large tracts of land and that there were "large tracts of excellent land" above the rivers which "could be converted into the most productive farms if water was supplied." This project "would not require a large outlay of money," and "the Indians would gladly do the work for small wages." The report continued:

> The land on the north fork of White River alone that could be redeemed has been ... [variously] estimated from 15,-000 to 25,000 acres. It would require a skilled engineer to survey the ground and locate the dam, but there is no question of its feasibility. The project is too great an undertaking for the Indians, and unless the Government takes it in hand this land, which would furnish permanent support for the greater part of the tribe, will remain a grazing ground for the Indian ponies and burros.

Although the cost of financing the development of irrigation may have been minimal, plaintiff offered no evidence or legal authority that the Government obligated itself to supply the funding. Moreover, the feasibility of irrigating an estimated 15,000 to 25,000 irrigable acres was not supported by any subsequent engineering study.

The Annual Report for 1900 recommended that the "Government furnish a competent engineer to survey irrigation ditches along larger streams and expend a few thousand dollars in starting a reasonably good system of irrigation" for the Indians. An engineering feasibility study was performed in 1900 and 1901. The engineer retained for the study submitted plans for developing irrigation on a total of 13,800 acres—5,000 on the west side of the North Fork of the White River, 8,000 on the northwest side of Bonito Creek, and 800 on Cibecue Creek. Dr. Brockway was the only defense witness of the opinion that part of the Cibecue project was implemented insofar as he viewed it as improving existing diversions on Cibecue Creek. Plaintiff says that the Cibecue project was not pursued because, as Indian Agent A.A. Armstrong wrote in 1901, valuable copper lands in that area might be cut off. This was Agent Armstrong's reason for waiting

for completion of the other projects to augment the facilities at Cibecue. The 1927 Annual Report by Superintendent Charles L. Davis reported that "larger units can be taken under the several ditches there, but the supply of water is too limited for any extensive undertakings." The evidence on the extent to which the Cibecue project was implemented or the reasons why it was not is inconclusive.

According to plaintiff, the project at Bonito Creek was not undertaken because H.O. Stabler of the United States Forest Service was of the view in a 1906 report on the proposed annexation of reservation forest to national parks that the downstream users' rights were paramount:

I believe that in this way two or three townships of productive land could be put under ditch. I hardly think that the Reclamation Service would approve such an undertaking until it had been fully determined after several years experience that the amount of water needed for this undertaking could be spared safely from the Salt River Project at Roosevelt.

Dr. Brockway pointed out that Mr. Stabler cannot be credited with knowing very much about irrigation: Two or three townships comprise 69,000 acres, and the highest estimate for irrigable acreage on the reservation had been 25,000 acres. Dr. Brockway was correct that the initial engineering report on the 8,000–acre project for all practical purposes was never mentioned again.

For the period 1900–August 13, 1946, the only proposed irrigation developments to receive substantial encouragement and support by the Government were two related projects on the White River. One was the so-called Bear Flat Project for 5,000 acres on the North Fork of the White River, and the other was the Whiteriver Power and Irrigation Project for from 500 to 5,000 acres. Defendant argues that the projects for reduced acreage were pursued because the earlier reports vastly overestimated the amount of irrigable acreage, given the records indicating that far fewer acres were suitable for irrigation and the existing level of technology. Plaintiff's position would seem to be that the Government was obligated to follow through with these projects once they were recommended, irrespective of considerations of technical and economic feasibility, even though federal funding was required.

The 1913 Annual Report revived interest in the 5,000–acre Bear Flat Project:

It is very desirable that steps be taken for the irrigation of some five thousand acres of land lying within six miles of the agency. This would make it possible for the Indians to raise a greater food supply and to farm along better lines. In addition, it would bring their work in one place so that it could have more satisfactory and intelligent supervision.

C.A. Engle, Assistant Engineer, United States Indian Service, authored a report dated November 13, 1914, on "power and irrigation possibilities" on the reservation, noting in pertinent part:

Owing to the mountainous character of the country there is but one tract of considerable size that seems susceptible of irrigation. This is a tract of about 5,000 acres of level mesa land lying to the west of Fort Apache. While the irrigation of this land would greatly benefit the Indians, it cannot be said that they have a valid right to the water for its irrigation. Any attempt to increase the irrigated area in this reservation to such an extent *would certainly be an invasion on the water rights of the Salt River Valley and would meet with the opposition of the water users*. The only way in which a portion of this land might be put under water would be to transfer to it the water now being used on an equal area of river bottom lands. These bottom lands, being subject to the erratic changes of the stream channels caused by the frequent floods, which also destroy the diversion dams and ditches, this transfer might warrant serious consideration, especially in conjunction with the new power plant contemplated at the Whiteriver Agency.

(Emphasis added.)

Superintendent of Irrigation F.R. Schanck, of the United States Indian Ser-

vice in California, submitted a letter dated March 31, 1914, to the Commissioner of Indian Affairs, forwarding Engle's November report (which appears to be post-dated). At this point the project took the objective of irrigating 3,000 acres of the Bear Creek tract, as well as providing power to the United States Army Post and agency school. Mr. Schanck opined that the tract, consisting of from 3,000–6,000 acres, "is probably the only one of any considerable area which can be irrigated on the Fort Apache Reservation." He suggested that the cost of irrigation might be defrayed by supplying power to the Army Post. Mr. Schanck envisioned that funds would be provided by the Government in increments as the project progressed. However, he cautioned, as had Mr. Engle, that the project might impinge downstream users' rights, referring to the opinions of other individuals. Although plaintiff failed to introduce these exhibits through Mr. Corke, they will be considered in that Mr. Schanck relied on the views of these officials.

C.R. Olberg, Mr. Schanck's predecessor, wrote to the Commissioner of Indian Affairs on September 26, 1913, reporting the views of Mr. Truesdell, Special Assistant to the Attorney General. Mr. Truesdell had expressed concern that incurring the cost of a detailed survey for the project would be unwise when the availability of the waters is "so doubtful." These gentlemen viewed the Government's commitment to the Salt River Federal Reclamation Project as a prior, superseding obligation taking precedence over the tribe's reserved rights to sufficient water for the purposes of the reservation. The dilemma was expressed thusly:

> [T]he water rights of the Government, on behalf of the Fort Apache Indian Reservation, would consist of all waters that have been diverted and put to a beneficial use with priorities as of the dates of such appropriations. Such rights are undoubtedly valid, even under the state and territorial laws. Also, under the doctrine of reserve rights, the Government, by creating this reservation for the purpose of civilizing the Indians, reserved suffi-

cient water for the purpose of the reservation. How much water is reserved in such cases is still a matter of doubt. The few cases on the subject do not fully clear up this point. The most that could be claimed would be sufficient water for irrigating all of the lands of the reservation that could be irrigated from the river flowing through it. Perhaps a more reasonable view would be that the Government is entitled only to enough water to irrigate sufficient land to give each Indian an irrigated tract such as the Government is accustomed to give when it makes allotments of land of that character.

In considering the water rights in connection with this reservation and those in connection with the Salt River Reclamation Project, it must be remembered that the Government is the proprietor of both and that its obligations, generally speaking, to the reservation Indians, are moral ones only, so that, if the Government in carrying out its Salt River Reclamation project obligated itself by contract or otherwise to so use the waters of the Salt River for that project as to prevent its using this water on the Indian reservation, it would be bound to fulfill its engagements in respect to the Reclamation project, even though by so doing it was hampered in the use of the water for the Indian Reservation. I do not know what the facts are, but I fear that, in the carrying out of the Reclamation project, the possible future irrigation for the Indian reservation was ignored, and that our only hope of getting water for that Indian reservation is in the event that there is now available for the Reclamation project more water than the Government is under any legal obligation to devote to the irrigation of lands under the Reclamation project, so that it could properly irrigate these Indian reservation lands, or some of them, rather than bring into cultivation new lands under the Reclamation project. As I see it, if there is any such surplus of water it is just a question of whether the Government will

use that surplus in one place or the other. On behalf of using it on the Indian reservation there is this to be said: that the Government is under a moral obligation to permit these Indians to remain and make their homes in the region that they have been accustomed to live in; that to do this in the best way under the policy of individual allotments, these lands will have to be irrigated; that irrigation so near the source of water supply would permit of the use of all of the return flow upon the lands of the Reclamation project below, and this return flow would of course be considerable; and also that, to use water so near the source of supply would be to make a saving on account of seepage and evaporation, that is to say, that the further up the stream you use your water the less these losses amount to. On the other hand, it will of course be argued, and properly, that lands under the Reclamation project are capable of a higher and more productive agricultural use than these reservation lands, which are at a much greater altitude and do not enjoy such favorable climatic conditions, transportation facilities, nearness to market, etc.

Acting Chief Engineer, Office of Indian Affairs, Schanck again advised the Commissioner of Indian Affairs on October 3, 1914, in retransmitting his March 31 report, that the area to be served was 3,000 acres, reiterating that the land is "the only tract of any magnitude on the whole reservation which may be irrigated." He recommended that the power-irrigation project be approved and that Congress be asked to appropriate money for its initiation. The misgivings of Messrs. Engle, Schanck, and Olberg thus did not stop the Whiteriver Power and Irrigation Project; but fairly quickly funding became problematic, and the need for an updated and expanded power system emerged as the dominant priority. Chief Engineer Reed on May 31, 1915, wrote a memorandum bemoaning the "grave danger" of the agency's being without light or water. Irrigation of 4,000 acres was being considered, but "this

brings up a possible conflict with the water users of the Salt River Valley...."

Engineer Engle wrote on July 15, 1916, that the irrigation project was still under consideration, advising that "any definite plans for the execution of this work should be preceded by more refined and extensive surveys than we have yet made...." He again asserted that the project would be an invasion of the rights of downstream water users.

Ultimately, the irrigation component of the Whiteriver Power and Irrigation Project was not completed. "Concern over Salt River water rights" was one reason, according to Dr. Hamilton, but the impediments that were at least as responsible for its not being realized were cost, feasibility, and the priority of the power plant. For example, as of 1916, the plant was intended to irrigate 507 acres by power and pumping and 227 additional acres were to be irrigated by gravity. "It would be highly desirable to have this large area under irrigation [3,000–5,000 acres] but such a project will take a great deal of money and considerable time and the immediate need for the other [power] is very pressing ...," wrote W.M. Peterson, Superintendent, United States Indian Service, Whiteriver, on June 12, 1916, to the Commissioner of Indian Affairs.

By the time construction began in 1919 after surveys had been made during 1913–1915, the acreage planned to be irrigated was located near the school and agency. In November 1920 the work was demolished by a flood on the White River. During 1920 federal funds were not available to complete the power and pumping plant. The 1921 Annual Report states that two congressional appropriations had been exhausted, yet the power and pumping plant was not complete. As of 1923 Superintendent Charles L. Davis, United States Indian Field Service, Whiteriver, reported that the scaled-down project had cost $75,000–$48,000 from tribal monies and $28,650 from the gratuity appropriation. He noted his understanding that no additional federal funding would be made available that year.

Superintendent Davis stated that mechanical problems in connecting pipe had not been solved; that, "[a]s a matter of fact nothing of any worth has been done in the way of construction of this [one] canal...." near the school and agency; and that "a considerable sum of money" would be required to complete it.

Herbert L. Clotts, Supervising Engineer on the project, in his report of January 19, 1923, and letters of March 16 and June 13, 1923, decried Superintendent Davis' report, pointing out that the tribe should benefit from irrigation facilities, not the school and agency. He said that the school and agency power enhancement should be paid from agency, not Indian, irrigation funds. Specifically, he charged that the School and Agency Light and Power Account was not being debited in proportion to the use for these purposes and that the irrigation was used on mostly school and agency land: [6]

If the irrigation facilities are neglected and the plant used mostly for lighting and industrial power, the charge against the irrigation works would be most unfair. Also, if the irrigation system is used mostly to irrigate school and agency land to the practical exclusion of individual Indians, the irrigation charge reimbursable from tribal funds would be most unjust to the Indians.

Of the 500 irrigable acres on the mesa, 160 have heretofore been used by the School or Agency, and none by the individuals. Either the land should be used by the Indians or the reimbursable charge wiped out.

The high cost of the canal is due to the fact that much of it had to be patrolled, repaired and in some cases rebuilt and finally partly lined and flumed before the material could be controlled. Aside from this it is believed that the costs of the other features are reasonable considering location, labor and material prices.

The Annual Report for 1924 pessimistically reported that the irrigation system was inadequate for the needs of the boarding school. By 1928 Mr. Clotts and Superintendent Davis were in substantial agreement: Approximately 197 acres were then susceptible to irrigation, with a potential of 600 acres, according to Mr. Clotts' January 10, 1928 report, and the Indians were making use of irrigated land. In his 1924 Annual Report, Superintendent Davis, reporting completion of the project, stated:

A power plant was recently built for the use of the Agency and boarding school and at great expense. This plant serves well for power purposes but the hopes and forecasts as to irrigation have not been realized. An appropriation was made by the last session of Congress in the amount of $2600 to extend this, but it is very doubtful if any great success can ever be achieved. It was expected that this system would irrigate 300 or 400 acres for distribution to the Indians, but so far it has been inadequate for the needs of the boarding school, and it is very doubtful if the Indians will ever get any benefit from it except through the boarding school.

The 1926 Annual Report by Superintendent Davis noted:

The irrigation system put in a few years ago, and which was intended to provide waters for irrigation for this farm, has proved almost a complete failure so far as irrigation is concerned. The single-unit system will not stand up under any continuous pumping, and in fact the plant will not operate two turbines, one for light and power purposes and one for irrigation, at the same time. Then the land formerly intended to be served cannot be successfully irrigated without de-

**6.** Mr. Clotts may have identified a viable accounting claim if it is true that appropriations for irrigation of Indian lands were used for BIA agency and Indian boarding school power uses. The evidence as a whole fails to support a finding that the irrigation project was not developed because Indian funds were channeled into the power project; rather, the power and pumping project was implemented over approximately five years during which the power needs grew, the technology of the project could not accommodate these needs, and the irrigation objectives took a back seat.

stroying the soil through erosion. As it all lies on a rocky bench with no sub-soil, the water put on for irrigation purposes keeps going down, so that it would require almost continuous irrigation to grow crops successfully.

The documents available from the 1930's show that both federal and appropriated Indian funds were used to add to the irrigation structures. The principal projects were to rehabilitate the small irrigation systems installed by Army engineers years before along the bottom of the canyons. By the 1940's the Whiteriver Power and Irrigation Project still had failed to realize its goal of both providing a power source for the school and agency and irrigating Indian farmland. In 1939 the tribe had requested approval of an appropriation of $25,000 of its funds, along with a $50,000 congressional appropriation and $25,000 in Civilian Conservation Corps funds, to construct a pipeline for Diamond Creek to augment the power of the Whiteriver Power and Irrigation Project. In 1941 the tribe resolved to contribute $35,000 of its funds. Superintendent William Donner asked for the requisite approval. (The project was not pursued because another water source was tapped by 1943.) By 1942 Superintendent Donner took the position that the canal was not large enough to supply power for both purposes, given that the power requirements of the school and agency, and now a hospital, had expanded. He acknowledged that agency employees demanded and were granted "increased electrical conveniences" by the Indian Affairs Office. The consequence was deferring the irrigation of Indian lands and irrigation was "given a second consideration" as he wrote the Commissioner of Indian Affairs on November 28, 1942:

In accordance with our records we have spent to date $134,114.88, excluding funds expended from CCC and our local Agency IMPL Support. The question of an annual construction charge brings up various complications which is rather hard to explain to those not thoroughly familiar with local conditions. In the first place it must be remembered that

the above amount expended included the construction and equipping of a power plant hydro-electric system for the schools and Agency. In fact, the bulk of the money above referred to was spent for this purpose. When this plant was constructed in about 1921 and 1922, it was to serve a dual purpose, namely, to provide hydro-electric power for the school and agency through one unit, and power for irrigating the school and agency campus, school and agency farms and land which was to be irrigated and allotted to various Indians below the school and agency campus and farms between Whiteriver and Fort Apache with a second unit.

This irrigation scheme was never carried out simply because it proved to be impractical and of inadequate capacity to furnish power for the schools and agency and irrigation purposes. The canal was inadequate to supply water power to both activities and even if it had been adequate, the pumping system would have been inadequate to supply irrigation for the school and agency campus, keep up the school and agency water supply, irrigate school and agency farm land and irrigate Indian land beyond. The canal was gradually improved and enlarged but during that time the demand for power and light increased so rapidly that the capacity of the plant was insufficient to provide water for irrigation and soon became inadequate to provide domestic water supply and light and power for the increased consumption by reason of increased personnel, increased school capacity, addition of a sixty-bed hospital, with all electrical conveniences demanding twenty-four hour service and increased electrical conveniences demanded and granted to employees through direction by the Indian Office. This demand necessitated irrigation of Indian lands being deferred and given second consideration. The request for an adequate hydro-electric power station to divorce the utility load from the irrigation load was never accomplished because it

has been impossible to convince the Office to approve and foster a larger hydroelectric power system. With [sic] the consolidation of Whiteriver and Fort Apache taking over the Fort Apache power plant and connecting the two schools with a power line did not solve thepower problem but merely added to the complications.

These facts are mentioned in connection with irrigation because it is assumed that the above expenditures were primarily for irrigation purposes, whereas, the bulk of the expenditures thus far made were primarily for the improvement of utility service for the two schools, agency and hospital.

As of August 25, 1943, Superintendent Donner described the reconstruction of irrigation facilities:

Owing to the extreme floods some of the diversion dams were completely washed out and others need to be reconstructed and many lateral irrigation gates still need to be installed. This is based principally on the postwar project 1945 to 1950 as it is not anticipated that any funds will be available for new construction or reconstruction during the war.

Between 1933–1946 the Government constructed 213 stock water dams on the reservation under the auspices of federal programs; 6 such dams were constructed by the Indians; 134 additional dams were constructed, but it is not clear by whom. Of the total monies expended during this period for these dams, government programs contributed $222,000 and the agency/tribe, $16,000. The "Post-War Program" of July 1, 1944, reported:

Irrigation appropriations of $10,000 per year were made in 1938 and 1939, under which improvements were made to 20 of the irrigation systems between July, 1939 and February 1940, to the extent of $19,989.80. A large amount of CCC–ID work was done cooperatively on 18 of these and on 14 other projects from April 1, 1937 to June 30, 1942, to the extent of $95,705.01.

The foregoing summarizes the construction of irrigation facilities on the reservation up to August 13, 1946.

■ 4. The Government was under no obligation to fund construction of any irrigation projects, and the evidence is overwhelming that without congressional appropriations the funds allocated by the tribe were insufficient to finance projects like the Whiteriver Power and Irrigation Project. For example, the 1920 Annual Report reported that lack of funds stopped this project in mid-construction:

The only irrigation on the Reservation is such as has been mentioned above but there is now under construction a power and pumping plant at the Agency and School designed to put water on some 200 to 300 acres of land now idle or utilized under the dry farming system. By reason of inadequate funds this plant cannot be completed this year and will have to remain in an incomplete state until further funds are provided.

Requests that the Secretary of Interior approve appropriations from tribal funds always were accompanied by requests for congressional appropriations or government funding from other sources, such as Depression-era programs.

Troubling to the court are two matters regarding the Whiteriver Power and Irrigation Project: (1) the precedence of agency, school, and hospital needs for power over irrigation of Indian lands and (2) the statements of BIA officials that misconstrue the tribe's rights to appropriate water for beneficial use.

■ a. The failure to implement fully the Whiteriver Power and Irrigation Project so that the Indian lands could be irrigated—coupled with Superintendent Donner's acknowledgment that funds had been spent primarily for the power needs of the agency, two schools (as of 1942), and hospital—suggest that the project was mismanaged to the tribe's detriment. The agency facilities included an Indian boarding school and hospital to serve the Indians. One set of interests benefiting the tribe was enhanced at the expense of an-

other. That the interests competed for funds may amount to a breach of duty to account for application of Indian monies. *See supra* note 6. Certainly, the Government did not suppress the development of irrigation facilities on the project to benefit downstream users merely by choosing to commit available resources to other projects for the Indians' benefit. Development of the Whiteriver Power and Irrigation Project for even 200–500 acres was not not achieved because of two overriding factors. Primarily, the project was ill-conceived. The projections for power did not reflect adequately the power requirements. The irrigation structures were inadequate to generate the power required even before the agency, school, and hospital requirements increased. The other reason was limited funding. Given that the technological feasibility of the irrigation project never was more than speculative, as confirmed by the Annual Reports, it is found that the Government did not suppress the development of the irrigation phase of the project.

b. The SRVWUA's rights would not have been invaded by development of the Whiteriver Power and Irrigation Project for 5,000 acres, as then-Assistant Engineer Engle erroneously stated in 1914. Although the other officials sharing the same erroneous understanding voiced their opinions more tentatively, it can be found that the Government officials with responsibility for irrigation projects on the reservation periodically took the position that the SRVWUA's rights to the flow of the Salt River were prior to and superior to the tribe's. This viewpoint was incorrect. Plaintiff's Winters Doctrine rights have not been adjudicated, but, whatever their measure, they take their life from the date, at the latest, when the reservation was created in 1897 or as early as 1892 when the tribe was put on the White Mountain Apache Reservation and have priority over the rights asserted by the later-created SRVWUA.

■ Even if the trustee, as represented by certain BIA officials, failed to understand the law, a breach of duty is not proved unless this incorrect understanding caused any irrigation project not to be realized, putting aside the fact that the Government was not required to supply federal funds directly or to ask Congress for funding. The evidence is unequivocal that the officials on the reservation and in Washington, D.C., requested approval for appropriations from Indian funds for irrigation projects and also sought agency or other federal funds and congressional appropriations. It should also be emphasized that not all government officials had an erroneous understanding of plaintiff's water rights. For example, Mr. Engle later manifested a correct perception, as will be discussed.

The 1913 Annual Report said:

The water used on the reservation is secured from White River and its tributaries, and is secured simply by appropriation and use. The stream has it source on the reservation and no filing appears to be necessary. There are a large number of small ditches, but no large ones.

Superintendent Davis in his 1918 Annual Report stated:

No water rights have ever been filed. No adverse rights are being instituted by private parties, nor could such be done, as the local streams originate within the reservation and no other population resides on the reservation. As these waters are all within the watershed of the Roosevelt Reservoir they are subject to such rights.

The Commissioner of Indian Affairs understood the Winters Doctrine. Superintendent Donner had written the Commissioner of Indian Affairs on May 5, 1928:

The big thing on the Fort Apache Indian Reservation during the next few years will be the development of farms and homes through irrigation. The White Mountain Reservation is the leading storage reservoir for the Roosevelt Dam and I have been unofficially advised at various times that the diversion of water from the reservation streams on the reservation for the benefit of the Indians would be protested by the Salt

River Valley Water User's Association. If this association or any other Company below us has been allowed to appropriate all our waters on the reservation to land in the lower country at the expense of the Indians, surely there has been negligence somewhere. All of these streams from which we will draw rise within the reservation and water will be used on the land within the reservation.

I would like to have any information from you as to just what extent we could be restrained from using these waters on our own lands.

The possibilities of developing small farms for truck gardening, fruit raising, etc., are very extensive and I am making plans for such development in order that the Apaches might be more self-supporting. If we are now to be restrained from the use of our own water on our own land it is a serious situation and will place this reservation in a very critical condition as to future development.

By return letter on May 14, 1928, Commissioner Charles H. Burke instructed Superintendent Donner that plaintiff's rights to water for irrigation were preserved by the Winters Doctrine and requested that Donner report any instances of the tribe's being deprived of water:

Under the principle laid down in the so called *Winters* case reported in 207 U.S. 564 [28 S.Ct. 207, 52 L.Ed. 340] sufficient water for irrigation and other needs of the Indians was impliedly reserved for their use at the time of the setting aside of the reservation. The streams to which you refer rise within the reservation, and an opportunity for the utilization of water required by the Indians is afforded before it passes off the reservation.

Appropriation of waters for irrigation purposes on lands outside the reservation made in pursuance to and in compliance with State statutes should not affect the rights of the Indians. If the theory of law above expounded be correct such appropriations made in pursuance to the State law would be subservient to the rights of the Indians, providing the appropriations pursuant to State law were made subsequent to the setting aside of the reservation they would be subservient to the extent that the Indians had occupied the land and used the water on such land.

Your letter does not state that any action has been taken by the Salt River Valley Water Users' Association or others that in any way interferes with the use of water by the Indians on the reservation. It appears that you may have some basis upon which your statements are made that is not set forth in your letter. It is requested that you advise the Office as to whether or not the Indians have been deprived of any water to which they would be entitled under the foregoing principles of law.

Superintendent Donner responded on October 31, 1928, that although the amount of irrigable acreage seemed to be limited, the cost of irrigating it appeared to be high, and the effort would be advised except for the expected protest from the SRVWUA. He opined that the SRVWUA would win any case if such an irrigation project were undertaken, but did not indicate any instances where any Indians or the tribe itself had been prevented from using the water for irrigation by the downstream users.

Superintendent Donner testified before Congress in 1931. Hearings Before Subcomm. of the Committee on Indian Affairs on S.Res. 79,308 and S.Res. 263, 71st Cong., 3d Sess. 8647–48 (1931):

Senator THOMAS. Any complaint from any source against your using the water for irrigation purposes here?

Mr. DONNER. There has been some. I have proposed more extensive irrigation, and I have heard, not directly, but indirectly, through the Water Users' Association they have had filed on all of this water and that it belonged to them.

Senator WHEELER. They could not legally appropriate water on an Indian reservation.

Mr. DONNER. We did not think so either.

Senator WHEELER. They can not legally file on and appropriate any water on an Indian reservation.

Mr. DONNER. They can not file but they are politically strong enough to make an awful kick.

Senator THOMAS. We have a lot of people in the Indian Service to protect the Indians in their rights and to see that the Indians get a fair share of the natural resources of this State and community where they reside.

Mr. DONNER. We tried to do that. Senator, but we are not always supported.

On April 6, 1935, Superintendent Donner wrote Mr. Engle, now Supervising Engineer of the cognizant Department of Interior Irrigation District:

The Salt River Valley is watching every move we make on irrigation for the Indians, and if they found that we were trying to irrigate one additional acre they would protest and perhaps be able to overthrow the necessary improvements that we are trying to carry out.

Mr. Engle replied on April 13, 1935, showing that his erroneous view in 1914 had been enlightened. He stated that the *Winters* decision would be applicable to secure a priority to water as of the date the reservation was established. On July 10, 1936, Superintendent Donner reiterated his same concerns, pointing out that the difficulties in securing funds:

Two years ago there was submitted through the district irrigation engineer an estimate totaling $125,000 for the rehabilitation and improvement of the many small irrigation projects within this reservation. The district irrigation engineer submitted my recommendations to your Office with the suggestion that the work be carried over a period of two years. It seemed that our recommendations failed to receive action, and there was later an item put in the bill fostered by Senator Hayden of $10,000 as an initial amount to repair these projects. It

seems that this amount also failed to pass, thus leaving the reservation high and dry for these important improvements.

There is not another improvement on this reservation so important and so beneficial to the Indians of this reservation as improved irrigation facilities. We are not really in need of expert irrigation assistants, though irrigation engineers are more than welcome, but we do need funds with which to carry on these important repairs. ·

. . . .

I also wish to call your attention to the fact that the Fort Apache Reservation is a water shed for the Salt River Irrigation Project, and the Salt River water users are very jealous of any water used within this reservation, even though the Indians living within the reservation have a prior right through usage and occupation of this territory.

The historical evidence identifies the political power wielded by the SRVWUA. The documents do not indicate, however, that the Department of Interior suppressed irrigation projects on the reservation or prevented the use of Indian funds for projects that were deemed technologically and economically feasible. Plaintiff would argue that without Government funding plaintiff's exercise of its reserved water rights was illusory. However, the 1982 Court of Claims decision in *Gila River Pima-Maricopa Indian Community*, 231 Ct.Cl. at 209, 213–14, 684 F.2d at 852, 865, held that the Government need not maximize theoretical rights by funding projects that Indian tribes do not have the financial resources to undertake, even if the Government wrongfully allowed other water users to divert an Indian tribe's water, which is not the case at bar.

5. According to an analysis by defense witness Dr. Hamilton, at no time between 1902 and 1946 did the amount of cultivated and irrigated acreage exceed the amount of acreage that was reported as tillable. The Annual Reports prepared by the successive Indian Agency Agents and Superintendents

corroborate this analysis. Although some of the estimates of tillable acreage are not reliable, the evidence supports a finding that the Indians could have farmed more acreage during this period had additional irrigation facilities been constructed.

Plaintiff argues the "Post-War Program" developed by officials on the reservation and forwarded to Washington, D.C., shows that the Government suppressed development of irrigation facilities in order to benefit downstream non-Indian users. The report states:

*All of the reservation from its highest elevation to its lowest has been filed on by the Salt River Water Users Association and the consumption of every drop of water on this reservation is watched by this association because of the need for the same in the Salt River Valley.* The entire reservation is the watershed for the Roosevelt Dam and the Water Users Association. Much of the eastern and the entire northern boundary follows the crest of the White Mountains and the Mongollon Rim and all drainage within boundaries leads to the Roosevelt Dam, while those on the northeast and north boundary lead to the Little Colorado and into the Colorado River Basin proper. Any large expansion of the irrigation within the reservation, except the improvement of those many small projects established by the military long before the construction of Roosevelt Dam and its subsidiary dams, is blocked by the Salt River Water Users Association. Therefore, irrigation within the reservation constitutes *merely the improved irrigation facilities for the better utilization of the unquestioned water rights.*

....

The Fort Apache Reservation lies almost wholly within the watershed of Salt River, and is one of the major water sources for the Roosevelt Storage Dam. The proposed soil and Moisture Conservation projects are therefore important not only for the purpose of protecting and healing grazing and agricultural lands on the Reservation but also to assist in assuring a constant water supply for the Roosevelt Reservoir.

(Emphasis added.) Defendant rejoins that this document bears no indication that it was approved or accepted by officials in Washington, D.C. Examination of the exhibit in its entirety shows that it represents extensive knowledge of the reservation, consistent with other exhibits. Mr. Corke also testified that the Program was followed. It is therefore deemed reliable evidence of the Government's plan for development of irrigation facilities on the reservation between 1944–1946. However, the court notes that the quoted language is in error insofar as it states that the SRVWUA filed on the natural flow, as opposed to the surplus or flood waters.

The Program reports that as of 1944 the irrigated acreage on the reservation was 1,971 acres. That precise figure was reported in 1955 by a BIA Soil and Water Conservation Narrative Report as the amount of irrigated acreage, indicating that irrigation facilities were not developed for at least 11 years. A finding that the Program restricted development of irrigation facilities on the reservation is undercut by the Post-War Program itself, which allowed for expansion beyond the 1,971 acres, provided that "large appropriations" were received:

It is important that we should determine which practices can be successfully applied on this reservation because we have a potential dry farming area of 20,000 acres—only 3,000 of which is being farmed at present, whereas our total irrigable acreage area is not over 6,000 acres and large appropriations to defray the cost of irrigation structures and subjugation would have to be received before any considerable increase from our present 1971 acres now under ditch could be used. The expansion of our dry farming, on the other hand, could be effected with a comparatively small cash outlay.

However, the Program also stated that funding was sought primarily for improvement of existing irrigation structures:

In our future planning along agricultural lines we feel that only about 6,000 acres can be profitably irrigated. 4,000[7] of this amount is under irrigation but some improvements in the form of diversion dams, headgates and lateral outlets are necessary. *During the past six or eight years we have spent nearly $100,000 in various irrigation improvements.* Some of these improvements have been rather expensive because of unusual floods which destroyed some of the irrigation works installed. Our estimate for the next ten years, including maintenance, amounts to only $71,650 and consists of additional improvements to the old small irrigation projects along the various streams which were to an extent developed and in use before the question of water rights became pressing. Such development as we have planned with the $71,650 above mentioned, does not constitute the development of a lot of new land and the diversion of additional water from the various tributaries of the Salt River *but rather improvements to develop these additional lands and conserve the irrigation water over the present wasteful method with the early type of temporary structures that we have been getting along with.*

(Emphasis added.)

The "Post-War Program," in sum, evidences that BIA officials on the reservation once again misperceived the nature of plaintiff's reserved water rights and their priority over rights of the SRVWUA in respect of any "large expansion of the irrigating system." It shows that funding was not sought to expand the irrigation systems beyond repairing and improving the present irrigation structures. To find that the Government's conduct amounted to suppression would be unwarranted, however, on the basis of the following analysis.

6. The only irrigation surveys undertaken by the BIA were in 1900–1901 and 1913–1915. The technical feasibility of the projects investigated was far overestimated and the economic feasibility was contingent on federal funding. Since the Government had no obligation to develop the facilities, the notion that the facilities would have been expanded with federal funds had BIA officials not misperceived plaintiff's reserved water rights is speculative. In *Gila River Pima-Maricopa Indian Community*, the injury was not conjectural. The several tribes' water had been diverted upstream of the reservation. The Government was held liable for failing to provide an alternative source of water or going to court to establish the tribes' entitlement. Here, no one prevented plaintiff from diverting the flow of the Salt River for the beneficial use of the reservation.

■ The Government did not promote expansion of irrigation facilities beyond present structures between the mid–1920's and August 13, 1946, save for stock water dams. The documents depict the dependence of the tribe on the expertise and resources of the personnel who represented the Government on the reservation. Projects to expand and improve existing irrigation facilities were stimulated by the Government. Even though the BIA may have been more successful in expanding irrigation on the reservation had all its officials pursued their efforts undaunted by an erroneous view of the tribe's water rights, the evidence does not show that irrigation projects were disapproved, or halted, or abandoned because government officials misunderstood the nature of plaintiff's water rights. Moreover, the multiplicity of factors that affected development of irrigation facilities on the reservation must be underscored. Numerous documents depict destruction of irrigation structures due to heavy rains and storms before causes other than climate contributed to erosion; the limited feasibility of expanding irrigation with existing technology militated against incurring the costs of expansion; the shortage of Indian funds to

7. This figure conflicts with the 1,971 irrigated acres reported in a different section of the 1944 Program and noted in the immediately preceding quotation. The 1,971 figure is deemed more accurate, as borne out by other contemporaneous documents.

support these projects is documented fully; and the available funds, in the main, were applied to maintaining the old structures.

Mr. Corke was the BIA official who investigated during 1956 all irrigation systems and areas served by those systems on the reservation to develop evidence for the litigation that led to the 1963 Supreme Court decision in *Arizona v. California.* Plaintiff's Winters Doctrine rights were not determined by the special master in that litigation, but Mr. Corke concluded that 7,197 acres were practicably irrigable. He testified in this case that he had been instructed to base irrigable acreage on the acres historically irrigated, but it is unclear how many acres actually were irrigated at the time of his survey. Another BIA investigation in 1974 reported that 2,885 acres had irrigation supply systems. Therefore, the amount of acreage irrigated increased between the 1944 "Post War Program" and 1974 from 1,971 to 2,885 acres,[8] although who paid for the expansion and precisely when it occurred were not brought out at trial. The record permits the inference that the expansion occurred between 1955–1974, because the 1955 BIA Soil and Water Conservation Narrative Report shows that the amount of irrigated acreage remained consistent from 1944–1955.

The old documents paint an unvarying picture that the Government was viewed as a source of funding because of a lack of tribal revenues for irrigation development. Plaintiff could not show that it had the financial ability to develop the 13,800–acre project, or the 5,000–acre Bear Flat project, or the irrigation phase (500–5,000) acres of the Whiteriver Power and Irrigation Project absent federal funding. This point will be treated further in the discussion of damages.

### B. *Claims for continuing wrong*

■ Caution should be exercised in detecting the existence of a continuing wrong

because that concept is judge-made and not statutory. *See generally Navajo Tribe of Indians v. United States,* 9 Cl.Ct. 227, 257–58 & n. 27 (1985) (uranium and other claims). Ours is a system of common law, and judges are not restricted to codes. Nonetheless, the Indian Claims Commission Act waives the sovereign's immunity for a claim based on acts occurring before August 13, 1946: "No claim accruing after August 13, 1946, shall be considered...." 25 U.S.C. § 70a. Such a waiver must be construed narrowly. *See, e.g., United States Construction Co. v. United States,* 7 Cl.Ct. 47, 50 (1984) (citing cases) (order denying summary judgment). Moreover, a court must give meaning to every word of a statute. 2A Sutherland, Statutory Construction 63 (C. Sands 4th ed. 1972).

■ In his opinion in *Navajo Tribe of Indians,* reported at 9 Cl.Ct. 227, Judge Lydon discussed how the doctrine of continuing wrong was recognized in 1978 and developed thereafter. The decision in *Navajo Tribe v. United States,* 218 Ct.Cl. 11, 20, 586 F.2d 192, 198 (1978), *cert. denied,* 441 U.S. 944, 99 S.Ct. 2163, 60 L.Ed.2d 1046 (1979), recognized that

> if a wrongful course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could properly take account of and award relief for the damages or injuries suffered after that date from the continuing course of conduct which began prior to that time.

The requirements invoking the doctrine of continuing wrong are three: (1) There must be wrongful conduct; (2) it be continuous; and (3) it must have begun before August 13, 1946. For example, in the 1985 *Navajo Tribe of Indians* case, the court rejected liability for failure to close up mines that had been abandoned before August 13, 1946. An alleged wrong, Judge Lydon ruled, would not have been committed until a mine was abandoned and defendant's fail-

---

8. Although Messrs. Watson and Corke and Drs. Brockway and Hamilton gave opinions on the amount of acreage that was practicably irrigable as of 1956 and thereafter, making findings on this subject would be inappropriate. *See* Def's Memo. of Contentions of Fact and Law filed Sept. 17, 1986, at 4 n. 1.

ure to close it up occurred before August 13, 1946.

The difficulty, if not the mischief, posed by the doctrine of continuing wrong, as expressed by Judge Nichols in his concurring and dissenting opinion in the Court of Claims 1978 *Navajo Tribe of Indians* case, 218 Ct.Cl. at 33–34, 586 F.2d at 206, is the invitation to link similar conduct occurring after 1946 to an act occurring before that date that has been adjudicated wrongful. When Congress enacted the Indian Claims Commission Act for purposes of redressing past acts of government misconduct, of necessity two key dates were chosen—one as a limitations bar on claims and the other as a limitations bar on filing suit. The date of enactment, August 13, 1946, represented a legislative judgment that actions occurring after that date must be filed timely within the applicable statute of limitations and cannot be coalesced with pre–1946 wrongs.

It has been concluded in this case that before August 13, 1946, the Government did not commit any wrongful conduct regarding plaintiff's water resources that is cognizable under the Indians Claims Commission Act. Specifically, plaintiff claims that defendant was obligated to develop irrigation facilities on the reservation for all practicably irrigable acreage. This claim was dismissed from the litigation before trial. *White Mountain Apache Tribe,* 8 Cl.Ct. at 684; *see also White Mountain Apache Tribe,* 9 Cl.Ct. 32. Since plaintiff pursued this theory through its expert reports and defendant submitted opposing reports, trial only confirmed that plaintiff could not sustain its burden by a preponderance of evidence, even though the claim had no legal basis in the first place. Nor did plaintiff sustain its burden to show that prior to August 13, 1946, defendant either diverted plaintiff's water to benefit downstream users or otherwise suppressed plaintiff's exercise of its Winters Doctrine rights, whatever the quantification of those rights ultimately may be.

■ Even if the record could have supported a finding that the Government diverted plaintiff's water for the benefit of downstream users or otherwise suppressed exercise of plaintiff's Winters Doctrine rights, plaintiff has failed to show any basis for a finding of continuing wrong. Fundamentally, plaintiff's case supporting a continuing wrong concerning water resources is exactly what Judge Nichols warned against in 1978. Plaintiff surveyed the history of water on the reservation from August 13, 1946, to 1986 by stringing together a series of incidents that are similar in that they involve proposed projects or projects undertaken on the reservation which, in theory, if not in practice, would have the effect of maximizing the flow of water off the reservation to benefit downstream users.

For example, as discussed in part III of this opinion dealing with claims for forest mismanagement, in 1968 the BIA adopted a Forest Management Plan that significantly increased the timber harvest. In the southwest in a mountainous area that is the watershed to an arid downstream area, a decision to increase timber harvest obviously would release water for movement downstream. Indeed, by regulation, the BIA's forest management plans are required to state their impact on runoff. The evidence showed that there was no correlation between the amount that the harvest was increased and the amount that the SRVWUA and its advisors had suggested would be necessary to effect any significant increase in water release. The evidence did show that this particular management plan was undertaken consistent with recognized silvicultural principles for achieving a regulated forest. In a similar vein, plaintiff argued that the programs on the reservation both before and after August 13, 1946, to remove infestation of juniper and pinyon pine trees were designed to increase water yield. Eradication programs began in the 1930's under Depression-era federal and tribal funding to provide employment on the reservation and to control the infestations. One of the stated purposes of experiments with juniper-pinyon eradication in the 1950's and 1960's was to increase water yield, but the results

were inconclusive and the experiments were abandoned. Even if this stated purpose were improper, it does not change the motivation behind the work done in the 1930's.

Plaintiff also points to efforts of the SRVWUA in 1965 to convince the BIA and plaintiff to restrict plaintiff's development of water resources on the reservation to water recoverable through salvage alone. An agreement was drafted—it is unclear by whom—but the BIA did not approve it. Mr. Corke, who testified as a lay witness, was the proponent of this evidence. The forcefulness of his testimony overall was diminished because he disagreed with some BIA decisions that could be viewed as disfavoring the tribe (for example, in restricting his study of practicably irrigable acreage to historically irrigated acreage), while failing to credit decisions that were favorable (for example, in disapproving the draft agreement among the BIA, the tribe, and the SRVWUA that would have restricted plaintiff to developing irrigation or other water projects through salvage water). That the BIA considered such an agreement does not equate to suppression of plaintiff's water rights. If Mr. Corke was the BIA official responsible for derailing the draft agreement, the credit belongs not only to him, but also to the BIA. Moreover, Mr. Corke credibly cannot impugn the motives of the 1968 Forest Management Plan for the reservation, when he was the approving official and also approved an award for the forester who prepared it without making a contemporaneous record of his objections to the increased cut implemented under the plan.

Although the Government did not develop or encourage development of significant irrigation facilities on the reservation from at least the 1930's through the late 1970's, the Government was under no obligation to do so. However, the BIA did support—and in so doing publicly opposed the interests of the SRVWUA—the construction of Hawley Lake, a major recreational project on the reservation, in the mid–1960's. Moreover, plaintiff cannot attribute the cupidity of the SRVWUA to the Department of the Interior. The fact is that the SRVWUA may have found more favor in the Congress than has the tribe. The fact is that the SRVWUA lawfully can make any outrageous proposal it wishes other than in a judicial proceeding. The important fact is that the Government has not adopted any proposal before or after 1946 that would have prevented the tribe from exercising its reserved water rights. These various themes that plaintiff attempted to develop do not constitute individually or together wrongful conduct, nor do they constitute the same type of conduct that occurred before August 13, 1946, because they are too disparate in type of activity and in time.

## C. *Damages*

Even though forewarned in advance of filing its expert reports, *see White Mountain Apache Tribe v. United States,* 10 Cl.Ct. at 120, plaintiff came to trial with two untenable measures of damages: (1) the cost of constructing irrigation facilities for 49,808 allegedly practicably irrigable acres determined as of 1986 and (2) damages for the value to the downstream users of the water taken from the Salt River. The limit of liability, and the number of acres upon which damages must be calculated, is the value of irrigated acreage that had been cultivated and would have been irrigated, as of August 13, 1946, had the Government not diverted water from the reservation, which it did not, or suppress the development of irrigation facilities, which it did not. *See Gila River Pima-Maricopa Indian Community,* 231 Ct.Cl. at 213, 684 F.2d at 865.

1. The wisdom of requiring that all experts prepare and exchange expert written reports before trial was borne out by the evidentiary morass that ensued when the court during trial requested that Mr. Watson prepare a new damage calculation under a theory that plaintiff had not addressed. The court undertook this effort in the interest of justice because of the shortcomings of plaintiff's case in failing to present evidence of damages for alleged mismanagement of water under any com-

petent legal standard.[9] After noting its objection, defendant cooperated in this effort by attempting to refute the new approach to damages without the benefit of discovery, since the underlying documentation for plaintiff's revised damages was provided only at trial.

Specifically, Mr. Watson was tasked to develop a revised damage report based on the 13,800–acre project that had been recommended in 1900–1901. The three individual irrigation projects involved represented the only evidence of irrigation facilities that were considered, but not undertaken, during the claim period. Mr. Watson did a yeoman's job of modeling a proposal for financing, irrigating, and manning the irrigation facilities for 13,800 acres. Defendant's witnesses, primarily Dr. Brockway, mounted a spirited rebuttal, which missed the mark on some points because the defense did not understand Mr. Watson's underlying assumptions, as he demonstrated during his rebuttal testimony. Cross-examination does not substitute for a discovery deposition.

Although the court suggested that Mr. Watson proceed to develop financing for the three irrigation projects based on evidence of tribal income, such as hay and grazing revenues, Mr. Watson posited his damages on the assumption that plaintiff could have constructed the facility by obtaining a loan. In retrospect his approach makes eminent sense, because the doc-uments concerning farming and irrigation on the reservation show that no irrigation projects would have been undertaken without federal funds. The tribe did not have available resources to initiate or complete these projects. Under *Gila River Pima-Maricopa Indian Community*, the lack of financial ability is fatal to this analysis. Whether plaintiff could qualify for a loan in the 1900–1920 period or even federal funding as a reclamation project is speculative. The Court of Claims in *Gila River Pima-Maricopa Indian Community* looked solely at the tribe's finances, not hypothetical financing. This court follows suit.

■ After reviewing all the evidence on damages, the court concludes that even had liability been established, plaintiff should not be allowed to cure its proof by having its expert witnesses at trial offer new evidence utilizing a new theory.[10] Defendant was prejudiced at trial. Since November 7, 1983, the parties have understood that all expert testimony would proceed by the pretrial exchange of written reports, followed by the oral examination of these witnesses at trial. Even if defendant had not been prejudiced, the Watson recast is irrelevant because each of the three components of the 13,800–acre project was unfeasible as of 1900–1924, the years when they were under consideration and during which only the modest Whiteriver Power and Irrigation Project was attempted.[11] It is there-

9. The court was of a preliminary view during trial that some of the statements by BIA officials to the effect that the downstream users' rights were prior and paramount to the tribe's established liability. A thorough review of all the evidence shows that these statements were isolated and did not cause the Government to interfere with the funding of projects with plaintiff's money.

10. *See* Def's Brief filed Dec. 15, 1986, at 16–19, for a discussion of other defects in the Watson recast with which the court agrees, but which need not be separately set forth insofar as the decision to reject this evidence rests principally on the grounds set forth in the text accompanying this note. The court does rely on a recast of damages to plaintiff's rangeland prepared by defendant's expert Dr. John P. Workman. In contrast to the data in Mr. Watson's analysis, the data in Dr. Workman's recast were drawn from testimony of experts (that was consistent with their previously exchanged reports) and other documents in evidence.

11. Between 1919 and 1924, the Whiteriver Power and Irrigation Project was under construction. The original proposal for irrigating 5,000 acres was never pursued; the documents reveal that the acreage contemplated to be put under irrigation varied from 200–500 acres. If a reviewing court deems clearly erroneous the finding that the Government did not suppress development of the irrigation phase of the project, the record would not permit the calculation of damages, although plaintiff had ample opportunity to offer evidence that would have allowed a calculation. The revised Watson analysis would not be useful because (1) it has been rejected as untimely and (2) its underlying premise that the

fore found and concluded that plaintiff proved no damages.

■ 2. The claim for damages based on the cost of constructing irrigation facilities to irrigate what plaintiff views as practicably irrigable acreage based on present-day technology has been rejected. Evidence was lacking that plaintiff was prevented from irrigating any acreage or that plaintiff had financial resources to irrigate any additional acreage. Even if plaintiff had proved a continuing wrong, no legal basis for the type of damages sought by plaintiff exists. This is because the measure of damages is the diminished value of the acreage that plaintiff could have irrigated but for the Government's wrongful acts. No court has recognized damages in an action filed under the Indian Claims Commission Act premised on the cost of constructing irrigation facilities (absent a treaty, statute, or agreement obligating their construction) or on the value of water to a user who benefited by its diversion.[12]

II. *Claims for mismanagement of plaintiff's rangeland*

The Fort Apache Indian Reservation contains 1,664,289 acres of land potentially suitable for the grazing of livestock—virtually the entire reservation. This acreage spans a variety of terrains and altitudes, from the Sonoran desert zone, below 4,000 feet elevation, to the Spruce-Alpine fir zone, above 8,500 feet. Early correspondence and reports described the abundance of grass and other forage found on the reservation and compared the range resources quite favorably with grazing land in surrounding areas. For example, the BIA Indian Agent's 1881 Annual Report described the northwestern portion of the reservation as valleys with "excellent grass for grazing purposes...." Similarly, a 1901 agricultural lecturer recalled the original condition of the Salt and Verde watersheds: "In the swales and valleys of this

country, and wherever water was more abundant, the great bunch grasses grew luxuriantly ..., affording an abundance of native hay in the dry season and quickly freshening up into green forage after a rain...." Indian harvests and sales of as much as 1,500,000 pounds of native hay (in 1900) to the military post confirm the early productivity of plaintiff's rangeland.

Well before any substantial livestock grazing began on the reservation, the American Southwest, and Arizona in particular, became the locus of a rapidly developing range livestock industry. Overstocked herds in western Texas swelled into the Arizona territory beginning in 1876. By 1885 Governor F.A. Tritle likened Arizona to "one vast grazing field" and a "stock-raisers' paradise." Livestock numbers increased rapidly until by 1889 the governor's annual report noted that "the entire grazing area is nearly if not fully occupied where water can be obtained." Over the next few years, the combination of drought and overstocking took its toll on the condition of the ranges:

> [T]he grass supply soon diminished throughout the territory to such an extent that it was impossible to mature prime beef any longer on the open ranges, and the cattle owners were forced ... to sell their steers as feeders at greatly reduced prices to buyers from California, Montana, and Kansas.

Report of Governor of Arizona, 1893. Selling part of their herds at great financial loss was one option for stockmen to reduce grazing pressure on the land. Another option was to try to use the relatively ungrazed lands of the White Mountain Apache Indian Reservation, which in 1892 included the present-day Fort Apache Indian Reservation.

The history of non-Indian grazing on reservation rangeland began with individual incidents of trespass and ended with a

---

tribe had the financial ability to fund irrigation development is speculative.

**12.** The court ruled prior to trial that if a decision that plaintiff had failed to show some evi-

dence of a continuing wrong were not upheld, the record will be reopened for defendant to complete its case on continuing wrong. *See supra* note 1.

government-sponsored system of grazing permits under which the bulk of the reservation was leased to non-Indian stockmen. It is unclear when illegal trespass to graze sheep and cattle on the reservation began; however, the first incident appearing in the records occurred in 1891. To avert its cattle's removal from the San Carlos reservation by BIA agents, the Chiracahua Cattle Company requested that their trespassing cattle be allowed to remain through the winter of 1891–1892 and then later offered to pay a nominal amount for that privilege. Despite being informed by an Assistant Attorney General that no statutory authority existed for the lease of reservation lands under grazing permits, the Commissioner of Indian Affairs directed Acting Agent Captain Louis Johnson to allow the cattle company to leave its stock on the reservation through the winter and to collect a grazing tax from the owners. The record reflects an almost continuous presence thereafter on the reservation of non-Indian cattle. This was due primarily to the inability of the Army troops to patrol adequately the entire reservation and their failure to remove permanently livestock discovered there. Difficulties in collecting the grazing taxes were also noted.

As recounted earlier in this opinion, the White Mountain Indian Reservation was split in 1897 into the San Carlos and Fort Apache Indian Reservations. Although the vast majority of the trespassing cattle had been on the San Carlos portion prior to the separation, by 1898–1899 the number of reported non-Indian cattle on the Fort Apache Indian Reservation exceeded 1,000. The actual number of trespassing livestock is unknown, as their owners were not inclined to acknowledge their trespassing, whether accidental or intentional, and even less inclined to pay a grazing tax. On December 9, 1901, Secretary of the Interior E.A. Hitchcock approved the start of a livestock permit system on the Fort Apache Indian Reservation. No indications appear in the record that, as of that date, any observable overgrazing or erosion had been caused by livestock-raising activities on the reservation.

The establishment of a grazing permit system was a response to trespassing cattle. Central to its establishment, however, was the desire of the Indian Agents to develop income for plaintiff. The early Annual Reports are replete with comments concerning the need and prospects for achieving productivity from the reservation and for devising plans for enhancing the Indians' and tribe's income.

Plaintiff makes several claims regarding the Government's management of the rangeland on the reservation. Plaintiff's primary claim is that the Government allowed non-Indian permittee stockmen to overgraze their livestock on the reservation, thereby causing widespread erosion and deterioration of the land and encroachment of juniper and pinyon pine trees on the ranges. Plaintiff also contends that the Government carried out its grazing policy for the purpose of increasing the flow of water from the reservation for the benefit of downstream users. Finally, plaintiff claims that the Government's efforts to eradicate and control the growth of juniper and pinyon pine trees on the reservation were also intended to produce water for downstream users.

A. *Liability* (pre–1946)

1. Before reciting the history of permit grazing system, it is useful to define terms used by the parties' experts to evaluate range conditions on the reservation and to discuss generally plaintiff's theory. Plaintiff introduced its evidence regarding erosion primarily through the testimony of four expert witnesses: Dr. Joe C. Elliott, expert in botany and range management; Michael B. Kaczmarek, expert in geology, soil science, and ground water hydrology; Mr. Watson; and John E. Wicks, expert in appraisal and agricultural economy. "Range management" was a recognized science since at least the 1930's that sought to manage land for maximum livestock production consistent with its conservation. Since the 1940's the science has evolved into the management of rangeland resources for optimizing multiple land uses

consistent with conservation of the land. The quantity of livestock that can be grazed on a particular piece of land on a sustained basis without diminishing the ability of the land to support that amount of livestock is expressed as the "carrying capacity" of that land.[13] Carrying capacity is not a static concept and may be increased or decreased over time by changes in such factors as rainfall; species composition of vegetation; and grazing pressure, among others. Carrying capacity is measured in "animal units" ("AU's"), with one AU being the number of animals per year that would be equivalent in grazing requirements to a 1,000–pound cow.

Furthermore, the concept of "overstocking" must be distinguished from "overgrazing." Grazing a number of livestock on a range in excess of the range's carrying capacity constitutes overstocking. Although the long-term sustained yield of the land is exceeded, overstocking does not cause plant succession. Overgrazing is the result of livestock's eating and trampling the vegetation cover of the range to such an extent as to reduce the carrying capacity of the range. Overstocking and overgrazing can occur independently of each other.

A "range site" is an area of land in pristine condition that will produce a predictable amount of vegetation; and a "climax site," a range site in pristine condition, reflects a harmony between land and plants. "Primary succession" refers to the development of soil and plants to a climax community. After man has disturbed the land and altered the plant life, the plant life reflects "secondary succession." "Deviation from climax" is a method to determine "range condition" and was utilized by Dr. Elliott.

Finally, the term "accelerated erosion" refers to a land use practice and comprehends the effects of man's activities. "Natural" or "geologic" erosion does not reflect the influence or activities of man on the land.

Plaintiff's theory is that by issuing grazing permits and failing to prevent illegal trespass grazing, the Government allowed the range to be both overstocked and overgrazed, resulting in a permanent reduction of the carrying capacity of the rangeland and erosional damage to the land. Defendant offered evidence to show that any overstocking that occurred did not result in overgrazed conditions on the rangeland; that the Indians themselves overgrazed the range with their own cattle and horses; that any erosion detected on the reservation was the product of natural climatic forces, rather than overgrazing; and that observable erosion is far less severe than suggested by plaintiff.

2. During the time period relevant to plaintiff's grazing claims, the duties that the Government owed the tribe regarding the reservation's rangeland derived from the fiduciary relationship existing between the parties. The nature of this relationship was elaborated in *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. at 183, 624 F.2d at 987, and given further confirmation in *Mitchell v. United States*, 463 U.S. at 225, 103 S.Ct. at 2972.

In particular, where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underly-

---

13. More precisely, Dr. Elliott does not disagree with the definition of carrying capacity formulated in a text co-authored by defendant's expert Dr. Thadis W. Box: "'the maximum animal numbers which can graze each year on a given area of range, for a specific number of days, without inducing a downward trend in forage production, forage quality, or soil.'" Affidavit of Joe C. Elliott, dated June 26, 1986, ¶ 22 (quoting L. Stoddard, A. Smith & T. Box, *Range*

*Management* 183 (3d ed. 1975)). Out of an abundance of caution, the court has considered rebuttal affidavits submitted by plaintiff before trial that speak to defendant's expert reports, even if plaintiff did not draw from its witnesses testimony on point. The court is of the view that the affidavits, only to the extent discussed in this opinion, make points crucial to an understanding of plaintiff's expert testimony.

ing statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Navajo Tribe of Indians*, 224 Ct.Cl. at 183, 624 F.2d at 987 (citations omitted). In the case at bar, the Government established a program of leasing grazing land under permits to non-Indian livestock owners. It was under no obligation to do so. But having undertaken to administer this program, the Government was obligated to act in a fiduciary capacity toward those lands. Although the rules governing the relationship between private fiduciaries and their beneficiaries do not apply necessarily with full vigor to the Government-Indian fiduciary relationship, it is entirely appropriate to utilize the general law of fiduciary relationships. *Navajo Tribe of Indians*, 224 Ct.Cl. at 185, 624 F.2d at 988. Here, the Government was obligated to supervise the issuance of permits and observe the condition of the range to ensure that the permittee livestock levels and grazing activities did not cause the range to become overgrazed or increase its susceptibility to erosive forces. Consequently, the Government will be liable for any breaches of that duty proved by plaintiff. In contrast, liability cannot attach for the Government's failure to provide funds for fencing the range to protect the reservation itself from trespass or to protect the range within the reservation grazed by Indian cattle from encroachment by permittee cattle. The Government provided some funding for fencing and repairs, but it was not obligated by virtue of that effort to finance the completion or maintenance of fencing. *See, e.g., Navajo Tribe v. United States,* 9 Cl.Ct. at 416; *Navajo Tribe v. United States,* 222 Ct.Cl. 158, 163–64, 610 F.2d 766 (1979).

It is apparent from the record that an associative, if not causative, relation between overstocking and overgrazed and eroded conditions was observed on rangelands in Arizona surrounding Fort Apache and on the San Carlos Indian Reservations prior to the initiation of the grazing permit system on Fort Apache. Moreover, at the time the Government understood this rela-

tionship. BIA Indian Agent C.W. Crouse wrote to the Commissioner of Indian Affairs in 1902 listing reasons why the reservation should not be overstocked:

Some parts of the San Carlos reservation has been overstocked and it is almost ruined; this reserve, although adjoining the San Carlos is better suited for stock raising; it has more water and it is more mountainous; but it would in a very few years be in the same condition as some parts of our adjoining Indian land if allowed to be overstocked; it would be worthless to the Indian when he shall have had a herd or flock for himself.

A 1910 University of Arizona Agriculture bulletin by J.J. Thornber recounted the transition from luxuriantly-covered grazing ranges in the 1800's to overgrazed, eroded, gullied surfaces by 1908:

Under our arid conditions, this overstocking soon resulted in destructive overgrazing and tramping out of large areas of forage producing plants, often beyond recovery. With this completed, the herds were moved on to other less grazed districts to be denuded, in turn, of their plant growth. Naturally, such depletion of the plant covering was very much hastened and intensified by recurring droughty seasons or years, which matter became all the more serious with the gradual increase in stock over the country. After eating off closely and trampling out the plant covering in the neighborhood of watering places, the hungry animals were compelled to travel ever farther for grass, eventually wearing deep trails or paths across their feeding grounds, usually in the beds of draws, gulches, and other water courses. Later, not a few of these paths became cut down or eroded by storm water into deep gullies and washes.

. . . .

Thus, step by step, the ranges came to be stocked to their full carrying capacity, and finally, in the absence of any grazing regulations, overstocked. As a result of this, destructive overgrazing and tramp-

ing followed, which with recurring droughty spells, often of great severity, destroyed much of the grassy covering, leaving the bared, tramped, and cut-up surfaces in prime condition for erosion and gullying, which was the final chapter in the breakdown of the ranges.

Similarly, a 1904 United States Geological Survey paper on the Black Mesa Forest Reserve, adjacent to the reservation, described grazing conditions on a portion of the reserve, as follows:

> The Verde slope in the Beaver Creek watershed is an example of repeated overstocking. This district was formerly a source of great wealth to settlers and stockmen in that vicinity, but the excessive number of cattle and horses has finally resulted in the complete annihilation of the pasture.

The author proposed careful adherence to proper stocking levels: "Unless stringent rules are adopted, regulating the number of stock and the areas on which they shall be grazed on each permit, this condition will sooner or later obtain throughout the reserve." Indeed, defendant's expert witness in range management, Dr. Thadis W. Box—one of the leading range scientists whose chronological narrative and document collection on management of plaintiff's range provided an overall understanding of what occurred on the range—admitted that the consequences of overgrazing were well known by the turn of the century. Absent, according to Dr. Box, was knowledge of the carrying capacities and, hence, the proper stocking rates for ranges.

3. When the first grazing permits were issued on the reservation, the rangeland was, by all accounts, in good condition. Expert witnesses for both parties offered documents and their own calculations of the total carrying capacity of the entire reservation at that time. For plaintiff Dr. Elliott estimated the carrying capacity at 40,874 AU's in original excellent condition.

For defendant Dr. Box testified that 31,000 AU's represented a very rough estimate of the long-term carrying capacity. Dr. Box considered the initial carrying capacity impossible to calculate with any precision and irrelevant, anyway, since, he stated, any level of stocking changes plant composition and productivity such that the initial carrying capacity eventually stabilizes within a lower broad range of long-term carrying capacity.

■ Whether one accepts the initial carrying capacity or the long-term carrying capacity as the preferred concept for this inquiry, neither necessarily is determinative of the Government's duty not to allow overstocking and consequent overgrazing of the range. If it was difficult or impossible to determine the precise carrying capacity during the early Twentieth Century, the Government could have employed an approximate figure.[14] When even an approximation would have been wholly speculative, the Government was obligated, nevertheless, to reduce stocking levels on the reservation once it became apparent that existing stocking levels were causing the rangeland to become overgrazed and subject to erosion. If observable damage was being done to the range, the Government cannot avoid its duty by attempting to rely on its alleged inability to calculate carrying capacity with mathematical certainty. The duty of the Government to operate the grazing permit system in order to avoid overgrazing on the reservation was not satisfied solely by the Government's contention that it adhered generally to accepted carrying capacities at the relevant times in setting stocking levels. If overgrazed and eroded conditions were the result of following the accepted knowledge on stocking levels, it should have been apparent to the Government that the accepted carrying capacities were unreliable.

---

14. In 1934 the Secretary of the Interior became obligated "to restrict the number of livestock grazed on Indian range units to the estimated carrying capacity of such ranges, and to promulgate other such rules and regulations as may be necessary ... to prevent soil erosion." 25 U.S.C. § 466 (1982).

Moreover, despite the fact that four major range surveys were made on the reservation between 1912 and 1948, yielding estimated carrying capacities of between 31,000 and 44,000 AU's, defendant admits that the actual stocking rate always exceeded the estimated carrying capacities for the years 1912–1946. This effect was further concentrated by the fact that permittee ranges encompassed less than the entire grazing land of the reservation, which was the basis for the carrying capacity estimates.

Dr. Box stated that overstocking of the range with permittee livestock, at the expense of the long-term condition of the land, can be justified by plaintiff's need for revenue from the permits at the time. He argued that overutilization of plaintiff's range resources to generate present income could have been more important than a more modest use of the range that would have protected the renewable characteristic of the resource but yielded less short-term income. However beneficent Dr. Box's explanation may appear, it was not the Government's operative management principle at the time. BIA Livestock Supervisor Charles B. Metcalfe's 1915 Report to the Commissioner of Indian Affairs explains his range management philosophy:

> No range should ever have a large enough number of stock on it to endanger the permanency of the grasses, brush and other stock food products, as it is better to have a smaller continuous income than to graze an excessive number and damage the ranges thereby.

From such evidence it appears that the Government's accedence to overstocking was less a matter of deliberate and reasoned policy as it was a consequence of careless administration.

■ Dr. Box postulated that plant succession provides evidence of whether the range was damaged by overgrazing. Although he undertook no quantitative soil or vegetation tests, his on-site inspection confirmed that plant succession on the range did not exhibit changes in the last 40 years other than those a range manager would expect in range that had evolved from a pristine condition to what he described as a healthy range condition exhibiting secondary succession. This opinion was tied to Dr. Box's examination of several exclosures (fenced-off areas excluding cattle and horses) on the reservation, one of which was 40 years old. Because the exclosure and surrounding range exhibited little variation in plant composition, Dr. Box concluded that there had been no degradation to the range. Dr. Elliott offered the equally plausible opinion that the degradation was so severe that the exclosed range had not improved in the 40–year period. Based on the court's observation of the exclosures and adjacent open rangeland, the opinions on what plant succession reveals cancel each other out. It is found, based in part on the court's own observations, that present-day vegetation is consistent with overgrazed conditions—at least to some extent. The undisputed recorded historical evidence supports a finding that the rangeland was overgrazed.

4. The livestock permit system on the reservation lasted from 1902 until 1953. The record reveals that the number of permittee livestock increased from approximately 6,000 AU's in 1902 to a peak of 55,000 in 1920, then decreased until the permit program ended in 1953. These figures represent only the official reported permittee totals. Plaintiff presented ample proof that permit holders frequently underreported the number of livestock that they actually grazed on the reservation— some permittees by as much as 50 percent. This is not surprising, since evidence was presented that there were several years (some consecutive) in which no counts were made of the actual numbers of permittee livestock. Despite Indian opposition to the granting of permits to outside stockmen, the program went ahead. The rationale for leasing grazing land to non-Indians was twofold: 1) Collecting grazing fees was preferable in the BIA's eyes to continuing their futile efforts to remove trespassing livestock from the range; and 2) Indian Agent Crouse viewed grazing fees as a

useful source of funds with which to purchase livestock to build Indian herds.[15]

Agent Crouse's intention to help the Indians establish a successful livestock industry and thereby gain economic self-sufficiency was admirable. The grazing fees did provide thousands of dollars in revenue that enabled Agent Crouse to purchase livestock, primarily cattle, for the tribe. However, the permit system failed to curb trespass by outside cattlemen. More importantly, it coincided within a few years with the first reports of overgrazed areas on the reservation in the headwaters of Canyon Creek (1906) and Carrizo Creek (1910), both in the northwestern portion of the reservation. Reports from successive years documented the spread of overgrazed conditions from the western sections of the reservation to the northern and northeastern sections near McNary. The reports also contained numerous recommendations both that accurate counts be made of the number of permittee livestock and that livestock numbers be reduced on ranges that were noticeably overgrazed. Later reports described the continued deterioration of the Carrizo range—"a serious state of depletion" (1932)—and the "seriously overgrazed" condition (1937) of the lower elevations in the southern portion of the reservation.

Reports of accelerated erosion do not appear in the record until 1922 when an inspector wrote that the land in the valleys along Cibecue Creek and East Fork "is eroding rapidly." Inspector John W. Atwater's observation of rapid erosion indicates that the processes responsible for the erosion began earlier than 1922, although it is unclear just how much earlier. Three years later Forest Examiner E.M. Pryse commented that "most of the Fort Apache Reservation has been badly overgrazed...." He also noted what he observed to be the result of this overgrazing: "Irreparable damage has been done, especially in the way of erosion." Perhaps the most vivid description came from Superintendent Charles L. Davis in a 1927 letter to Arizona Senator Carl Hayden:

Where the ranges are grazed to the live stock capacity which the permittees would think right and proper the vegetation is so reduced on the land that the storm waters come down off the mountains in such torrents that it destroys the agricultural lands along the stream beds to an extent which no one can appreciate except by close personnel observation and a knowledge of what conditions were 10 to 15 years ago. Every little rainy spell now produces torrents from the mountains equivalent to the heaviest storms before the surface vegetation was so completely destroyed. This has resulted in such terrible erosion that it has washed away at least 50 percent of the lands formerly cultivated by the Apache Indians 10 to 15 years ago. Each of the remaining 50 percent has been left so high and dry and in such minor areas that water cannot be put on it at a cost which will justify reclaiming it. The agricultural products of the Indians have been reduced far over 50 percent through this cause since I have been here. It is a loss that no one can well appreciate until he sees it.

Plaintiff presented both historic and contemporary photographs depicting eroded land forms on the ranges. Furthermore, the court had the opportunity to view for itself many eroded areas during its on-site inspection of the reservation.

Although the Government does not dispute that erosion has, and is, occurring on the reservation, it attributes the cause to wholly natural climatic forces operative throughout the Southwest generally. Plaintiff contends that all erosion is accelerated erosion caused by overgrazing of permittee and trespassing cattle on the reservation.

5. Overgrazing apparently causes the available forage to be diminished, especially as less palatable plant species replace existing species, but it is not certain wheth-

**15.** Agent Crouse had begun to fund an increase in Indian herds in 1901 with savings achieved by reducing the Indians' beef rations by 25 percent.

er this phenomenon is temporary (and if so, for how long), or whether the change is of such lasting effect as to be considered permanent. Somewhat intertwined with the change in vegetation cover, however, is the far more substantial claim by plaintiff that overgrazing changed the vegetative cover and topography of the rangeland to such an extent that topsoil washed away, permanently eroding the landscape of the range and gouging the streambeds to levels below many of the existing irrigation channels.

It is unquestioned that substantial erosion has occurred on the rangeland and along the streambeds. The parties presented differing explanations of its causes. Plaintiff argued that overgrazing was the primary cause and that without overgrazing erosion would not have occurred on the reservation. Defendant conceded that erosion may be caused by any of three factors: climatic forces, internal adjustments of the terrain, and overgrazing. However, defendant contended that overgrazing was not an operative factor in any erosion that occurred on the reservation. Although the court agrees with defendant that overgrazing was not the sole cause of erosion, documents and analysis presented by Mr. Kaczmarek construct a credible explanation of how continued overgrazing could have reduced the vegetative cover of the range, leaving bare spots on the soil surface, increasing the aridity of the soil, and decreasing rainwater penetration of the soil. The scenario he developed suggests how overgrazing can change the character of the range, making it more susceptible to the erosive forces of nature, such as wind and rain. Eventually, the sheet and rill erosion caused by these forces result in concentrated channels of water creating gullies and arroyos. The end result is a loss of topsoil from the range and the destruction of farmland as benches along streams are washed away or irrigation facilities are left stranded by ever-deepening streams. Indeed, the primary source cited by both parties on the cause of arroyo spread, R. Cook & R. Reeves, *Arroyos and Environmental Change in the American South-West* 189 (1976), concludes that both climatic changes and overgrazing may have led to the vegetative changes responsible for arroyo formation in the Southwest.

6. Defendant also argued that much of the rangeland that plaintiff claims was overgrazed lies within the area around the center of the reservation that was used only by Indian herds and was never leased under grazing permits. In effect, defendant would place the blame for any overgrazing that may have occurred in that area squarely on plaintiff. Some of the relevant facts are clear. Even before the formal establishment of the reservation, the tribe had raised small herds of cattle. Since the turn of the century, the BIA had encouraged and assisted the expansion of individually-owned herds and tribal herds. Early reports indicated that Indian herds were well-distributed over the entire reservation. However, as more land was given over to permittee stockmen, the Indians' cattle were restricted to a smaller portion of the reservation that was known as the "Indian Range." Although its exact contours varied from year to year, depending on the area leased to permittees, it was generally located across the central portion of the reservation—an irregularly-shaped strip of land spanning from the East Fork of the White River to Cibecue Creek.

The record contains descriptions of an overgrazed Indian Range beginning at least by 1928. Superintendent Donner wrote, "The Indian range in most sections has been exceedingly overgrazed...." [16]

16. Superintendent Donner also noted that "considerably more territory has been taken over for Indian range in order to correct this condition and prevent excessive evaporation and erosion...." Indeed, range maps reveal an expansion of the Indian Range after 1922, but the added range often included areas where over- grazed conditions had been reported earlier. A 1936 Grazing Survey candidly admitted: "Approximately 190,000 acres are being withdrawn from white permittees for Indian use this year. However most of this land is also overgrazed and will relieve the overgrazed condition on the Indian range but little." In these circumstances

Superintendent Donner's observations were echoed in a 1932 report by Assistant Forester J.D. Lamont and in a 1936 Grazing Survey. Another 1936 report from soil conservationist Walter V. Woehlke further noted "dangerous sheet and gully erosion" on portions of the range used by individual Indian herds. Defendant argued that the Indians were responsible for any overgrazing that occurred on the Indian Range and cited several documents that attributed the overgrazing to Indian reluctance or refusal to move their herds to the higher elevation ranges during the summer. Such rotation would have relieved the grazing pressure on the lower elevation ranges that were used year-round. So framed, both problem and solution seem fairly straightforward.

However, the evidence suggests the reasons for both the overgrazing and the stationary Indian cattle are unclear. Some overgrazing on the Indian Range can be assumed to have been caused by Indian cattle. Yet, Supervisor Metcalfe noted as early as 1915 that badly overgrazed conditions on the permittee ranges across the northern part of the reservation had caused permittee cattle to drift "in great numbers south of these ranges on to the Indian reserve range, and the cattle of these permittees [to] mix with Indian cattle and graze the Indian range. This damages the Indian range...." The effect of trespassing permittee cattle must be considered as one cause of overgrazed conditions on the Indian Range.

Another explanation is provided by a 1932 letter from Assistant Forester Lamont to the BIA. Referring to the "badly overgrazed condition" he had found on most of the Indian cattle ranges, he reasoned, "This condition seems to be due to a lack of the proper distribution of the stock over the ranges. This has been brought about by the scarcity of water in some localities and the need for more fences...." Mr. Lamont's observation indicates that insufficient resources on the

ranges allocated to Indian livestock forced the livestock to concentrate in areas not large enough to support them without causing overgrazing.

■ The Indians' reluctance to rotate their cattle between summer and ranges is more complex. Defendant relied on the explanation provided in a 1936 Grazing Survey:

The main reason that the majority of the Indian ranges are overgrazed at present is that the Indians have always wanted their cattle in their backyards the year around where they could always see them and reach them easily if they wanted one for food. As a result the range in the approximate vicinity of an Indian encampment is badly overgrazed with many annual and poisonous species coming in and gully erosion starting.

If the Indians' convenience were the sole explanation, determining responsibility for overgrazing of Indian cattle would be an easy task. But other equally plausible explanations also appear in the record. For example, it is possible that the size of the Indian Range was insufficient to support the Indian livestock, estimated by Dr. Box to number in excess of 15,000 AU's by 1920. Furthermore, had the Indians wished to move their cattle to higher elevation ranges during summer months, it is unclear just where they were to go. Annual permit maps show that most of the higher elevation ranges in the northern and eastern portions of the reservation were under permit to non-Indians by 1913. By the late 1920's more summer range had been returned to the Indians, but the years of confinement to the smaller area apparently had instilled in the Indians patterns of stocking cattle not readily altered. Superintendent Donner reported in 1937:

All outlying sections were leased to white permittees for a great many years. Our Indians became so accustomed to having their livestock in the immediate surroundings of their habitations that it

it is not surprising that observers continued to report overgrazed conditions on the Indian

Range.

is quite a problem to get them accustomed to having stock out on districts formerly occupied by whites.

Since the evidence indicates that the Government was responsible for at least some of the overgrazing that occurred on the Indian Range, and since defendant had not been able to prove what portion of the overgrazing can be attributed solely to the actions of the Indians, the court finds no basis to treat the Indian Range differently from the reservation's rangeland as a whole for purposes of liability or damages.

7. One other issue of alleged Indian responsibility for overgrazing must be considered. Large numbers of wild horses and ponies also inhabited the rangeland, scattered widely throughout it. Defendant claimed that these animals belonged to the Indians. Although the horses initially were introduced by trespassing stockmen and multiplied in the wild, the Indians apparently considered themselves after some time the true owners of the horses. Complaints about the horses and the overgrazing that they caused appear repeatedly in the historical documents, as do complaints about the Indians' unwillingness to curtail their numbers or assist in their removal. The Government's agents claimed that they did not have the resources to accomplish this task. Plaintiff argued that the tribe also did not have the means to remove the horses; but it is unclear whether the true impediment was the tribe's lack of wherewithal or the Indians' attachment to the horses. Although some damage was done to the range by overgrazing of wild horses and ponies, the parties have not provided sufficient evidence to enable the court to determine who bears the ultimate responsibility in this instance.[17] Therefore, any contribution to the deterioration of the rangeland will not affect the measure of damages.

8. It has been found that overgrazing was a causative factor in the erosion that took place on plaintiff's range before 1946. Next to be ascertained is the amount of erosion attributable to overgrazing. Plaintiff took the position that overgrazing was the exclusive causal factor based on Mr. Kaczmarek's testimony that he considered and discounted climate as the causal factor. Even considering Mr. Kaczmarek's affidavit to amplify his rather conclusory testimony, see, e.g., Affidavit of Michael B. Kaczmarek, dated June 27, 1986, ¶¶ 58, 67, the witness convincingly could not eliminate climate as a profound force in this part of the southwest. Defendant took the opposite tack contending that, irrespective of any overgrazing, erosion on the reservation was caused by naturally occurring devastating climatic variations, i.e., climate superseded any other causal agent.

Mr. Kaczmarek's soil erosion measurement plots proved to be largely inconclusive about the rate of erosion on the reservation.[18] Mr. Watson presented on behalf of plaintiff an analysis of the relationship between historical precipitation measurements and streamflow data at locations both on and off the reservation. He at-

---

17. In Dr. Elliott's affidavit, see supra note 13, plaintiff attempts to place responsibility for the wild horses on the Secretary of the Interior by quoting a 1936 letter from Robert Marshall, Director of Forestry. Elliott Aff. ¶ 57. This letter makes reference to the Indian Reorganization Act, which outlines the Secretary's duty to restrict the number of livestock grazing on Indian ranges. If the letter, which bears no exhibit number, had been introduced into evidence as an exhibit, either at trial or by reference in an expert report, it is likely that plaintiff would have prevailed on the issue of wild horses, at least as to acts after 1934. Plaintiff's failure to follow through on its proof leaves the court unable to resolve the question of responsibility for the horses. Nevertheless, this uncertainty has the effect of benefiting plaintiff because the measure of damages will not reflect damage due to grazing by horses.

18. The testimony of defendant's expert geomorphologist Dr. William L. Graf undermined the value of Mr. Kaczmarek's study by critiquing the insufficient size of his samples, the lack of random distribution, and the remote timeframe (current) in which they were taken. The primary deficiency with this study is that measuring the rate of erosion on the reservation does not assist in identifying its cause. Correspondingly, accepting Mr. Kaczmarek's theory that overgrazing was a cause of erosion on the reservation does not equate the present rate of erosion to overgrazing.

tempted to demonstrate indirectly the cause and effect relationship between overgrazing and erosion by linking the peak period of reported overgrazing with a contemporaneous increase in runoff of water from the Salt River watershed. Mr. Watson first compared the precipitation measurements over time for two locations, the Whiteriver/Fort Apache stations (on the reservation) and the Natural Bridge station (off the reservation on the Verde River). Finding the recorded precipitation at both to be equivalent, he next compared the net runoff of the two watersheds by analyzing the historical streamflow data from two measuring stations further down the Salt and Verde Rivers, respectively. He then compared two periods in particular, 1917–1925 (plaintiff's claimed peak period of overgrazing) and 1941–1957, and found that the average summer (July-September) streamflow for the Salt River near Roosevelt Dam fell from 141,716 to 70,861 acre feet between the two time periods. Meanwhile, the equivalent streamflow for the Verde River decreased by only 15,650 acre feet.

Mr. Watson testified that precipitation for both measuring sites was relatively constant between the time periods.[19] He attributed the diminished net runoff on the Verde watershed to evaporation from the water stored at Horseshoe and Bartlett Dams, both constructed between the two measurement periods. For the higher net runoff figure along the Salt River watershed during the earlier period, Mr. Watson found the most likely explanation to be changes occurring in the vegetative cover on the reservation, more specifically overgrazing and timber harvesting.[20] The close temporal proximity of reports of overgrazing (and extensive timber harvesting) and a likely manifestation of erosion—namely, heightened water runoff from the altered landscape—was offered to corroborate plaintiff's contention that overgrazing and denudation of the rangeland in fact had occurred during or immediately prior to

1917–1925 period. It also showed a causal link between the overgrazing and eroded conditions on the ranges.

Mr. Watson's streamflow/precipitation analysis has several significant flaws, however, which were identified by defendant's expert Dr. Brockway. The most damaging revelation was that "as much as 500,000 acres of the [Salt River] drainage basin may lie beyond the Mongollon Rim [the northern geographic boundary of the watershed]...." A 1936 University of Arizona technical bulletin by Cooperrider and Sykes explains that large underground springs originating at sources beyond the reservation contribute to the Salt River's streamflow. This fact serves to diminish the utility of the precipitation data from Whiteriver/Fort Apache, because it greatly increases the area of potential sources of the flow of the Salt River and undermines confidence that an apparently constant rainfall total at Whiteriver/Fort Apache truly was representative of a watershed-wide precipitation constant.

Other problems arise, as well. Dr. Brockway's comparison of the precipitation data from the Whiteriver/Fort Apache station and other stations on and near the reservation shows a lack of correlation between the Whiteriver/Fort Apache station and the others. This further detracts from the representativeness of the Whiteriver/Fort Apache data.

Another objection can be found in Mr. Watson's use of average streamflows for the entire periods of comparison, 1917–1925 and 1941–1957. Simply comparing the arithmetic average summer streamflows appears to reveal a rather substantial increase in streamflow for the 1917–1925 period. But, as Dr. Brockway pointed out, elimination of three aberrationally high months from the data would reduce the average summer streamflow for the period from 141,716 to 92,755 acre feet—a far less

19. However, missing precipitation data for the Fort Apache station during the years 1919–1920 renders the comparison, and ultimately the conclusions drawn from it, less than certain.

20. Mr. Watson noted that the Unit One timber cut began in 1918.

significant deviation from the 70,861 acre-feet average of the 1941–1957 period.

The analysis provided by defendant's expert in meteorology, hydrometeorology, and climatology, Dr. William H. Haggard, further diminished Mr. Watson's analysis. Dr. Haggard replotted Mr. Watson's precipitation/runoff data and concluded that the relationship is not linear, but rather curvilinear. Citing a standard hydrology reference that confirmed the principle that precipitation/runoff relationships are invariably curvilinear, Dr. Haggard explained how the unusually high streamflows recorded, particularly in 1919 and 1921, could be attributed to greater than normal rainfall, which produced a greater runoff per unit of precipitation than would lower levels of precipitation. In sum, Mr. Watson's analysis and conclusions are constrained by the limitations of his data and add little to the concurrent observations of overgrazing and erosion during the period roughly from 1914 to 1927.

9. Defendant presented its climatic variability theory of erosion by way of two witnesses, Dr. Haggard and Dr. William L. Graf, an expert in geomorphology. Dr. Haggard described the reservation as "the region of greatest climatic contrasts and variability" in Arizona, and presented evidence detailing the annual patterns of localized, often intense, winter and summer precipitation events on the reservation. He also included chronological reports of the nature of, and damage from, these storms. Finally, using historical precipitation and streamflow data and indirect soil moisture indices, Dr. Haggard attempted to show how alternating drought and moist periods coincided with the approximate time of reported erosion. Specifically, the period 1899–1904 was a period of drought, followed by rapid transition to very wet conditions by 1905, which continued through 1920. According to Dr. Haggard, the summers of 1919 and 1921 produced exceptionally high levels of rainfall, and flood-level streamflows occurred in January 1916. Such examples of large episodic climatic changes on the reservation were responsible for conditions in which increased streamflows intensified the rate of natural erosion, according to Dr. Haggard.

The focal point of Dr. Graf's testimony was his statistical analysis that attempted to quantify the relative influences of climate and grazing on erosion. Dr. Graf's regression analysis correlated variations in measured streamflows, which he considered indicative of sediment transport and, in turn, the degree of erosion, with variations in climate and livestock numbers. According to Dr. Graf, climatic variation accounted for 55 percent of the variation in streamflow, while stocking variations explained only one percent of the streamflow. Therefore, he concluded that climate was a far more significant factor in erosion than was grazing.

Dr. Graf's methodology, and hence his conclusions, suffer from the uncertainty inherent in several assumptions underlying his calculations. The first is that changes in numbers of reported livestock are the proper measure of the effect of grazing as a variable to be used in the regression analysis. As Dr. Graf admitted, data concerning the distribution of livestock, had they been available, would have been significant for this type of analysis. Dr. Graf also stated that it would have been preferable to use the distribution in vegetational changes as the variable for grazing effects. The court is not convinced that variation in livestock numbers, by itself, accurately reflects the contribution of overgrazing to the erosion that occurred. Second, the assumption that variation in streamflow at a single location on the Salt River is an accurate indicator of the extent, nature, and timing of erosional events on the entire reservation must be viewed with the same skepticism as it was in plaintiff's precipitation/streamflow analysis. Third, the apparent statistical correlation between contemporaneous changes in the climate and changes in streamflow (or even erosion) simply does not address the influence that previous incidents of overgrazing may have had in increasing the susceptibility of the range to subsequent erosive forces of the climate.

Dr. Graf also attempted to bolster defendant's climatic theory by noting that an earlier episode of apparently heavy livestock grazing in New Mexico did not result in accelerated erosion or arroyo cutting. However, inspection of the less-than-complete document submitted by defendant, and written by William Denevan under the title "Livestock Numbers in Nineteenth-Century New Mexico, and the Problems of Gullying in the Southwest," reveals the author's (or the abstractor's) view that the study "also gives some new support to the older view that overgrazing was a major contributive factor causing severe modern gullying." In particular, Mr. Denevan explains why overstocking was associated with erosion in the Southwest in the 1880's, while the earlier high stocking levels did not produce erosion:

The lack of gullying in the 1820's and 1830's when sheep numbers were relatively high can be attributed to higher than average annual rainfall and a vegetation cover that was in substantially better overall condition than it was in the 1880's when overstocking followed a period of subnormal rainfall. . . .

Furthermore, to the extent that Dr. Graf criticizes plaintiff's association of erosion events on the reservation with those occurring in southern Arizona, he gives no assurance that his similar comparison with erosion events in New Mexico yields any more meaningful conclusions.

Finally, the sequence of overstocking/overgrazing and erosion both on the reservation and elsewhere in Arizona lends support to plaintiff's theory that a causal relationship existed between overgrazing and erosion. The introduction of large numbers of livestock onto most Arizona ranges occurred during the 1870's and 1880's. By the 1890's observers noted the ranges to be in an overgrazed condition, and accelerated erosion and arroyo cutting soon followed. That this phenomenon was not repeated on the reservation until the 1910's and 1920's has two possible explanations: 1) The climate on the reservation was so different from the rest of the Arizona that the climatic conditions necessary to cause accelerated erosion were not present until 30 years later; or 2) the erosion observed on the two areas was in some way influenced by the overgrazed condition of the land.

■ Although defendant's witnesses testified to the variety of climates found in Arizona, they presented no climatic data to show how the reservation's climate was so unique as to escape the fate of accelerated erosion that beset surrounding ranges during the 1880's and 1890's. The repetition of the sequence of overstocking, overgrazing, and erosion is not conclusive proof of a causal relationship between grazing and erosion, but it is compelling evidence. It reinforces the court's finding that neither climate nor overgrazing was the sole cause of accelerated erosion on the reservation, but rather that the overgrazed condition of the reservation's rangeland predisposed it to the erosive forces of the climate, ultimately resulting in the damaged and eroded condition that persists today. Since the Government initiated and condoned the stocking conditions that produced overgrazed rangeland, in breach of its fiduciary duty, it must be held liable for the accelerated erosion that resulted. This finding that the Government is responsible for overgrazing must be qualified, however. The predisposition of the range to the erosive forces of climate is not tantamount to a finding that defendant is responsible for all the erosion visible over half a century later. Dr. Haggard's testimony was eloquent on the devasting effects of rainfall northeast of Phoenix. Absent overgrazing, climate would have inflicted damage. But it cannot be found that climate was the superseding causative agent during the period 1900–1935. The evidence reveals how climate operates in naturally arid or overgrazed land. It does not show that range not subjected to overgrazing suffered the same consequences as overgrazed range. For its part plaintiff has not quantified the acreage, but argues for all its range. This approach ignores the role of climate. Consequently, the court has made adjustments in plaintiff's analysis of diminished carry-

ing capacity to account for the role of climate.

10. Another facet of plaintiff's claims for mismanagement of its rangeland involves the encroachment of juniper trees onto the rangeland. Although the primary focus of this claim is juniper trees, it also includes to a lesser extent pinyon pine trees. The discussion speaks in terms of "juniper" to include pinyon trees, as well.

This claim is intimately associated with plaintiff's erosion claim, because plaintiff alleges that overgrazing the livestock reduced the vegetation cover of the land. According to plaintiff, the resulting condition both gave juniper seedlings a greater opportunity to establish themselves among the grasses and reduced the frequency of fire hazard to young junipers. As junipers proliferated, plaintiff argued, grasses and other range forage suffered from the competition and the ranges experienced a decrease in carrying capacity.

Dr. Elliott presented documents and testimony in support of this claim. Both Dr. Box and he agreed that juniper has increased in density throughout its normal range, both on the reservation and in other areas of the Southwest since about the turn of the century. A 1924 article by Aldo Leopold of the United States Forest Service sets the beginning date for brush (including juniper) encroachment of the ranges in southern Arizona at the mid–1880's. This would coincide with the timing of the heaviest livestock grazing in that area. The article attributed the cause of juniper proliferation to the effects of overgrazing, namely reduced risk of fire damage and lowered competition by grasses for water and soil nutrients. Mr. Leopold further supported this theory by establishing the date of the onset of the juniper invasion through inspection of tree rings, which indicated an even-age stand of trees all less than 40 years old. On the reservation the juniper encroachment was first noticed during the 1930's, which implies that the infestation began sometime earlier. Associate Regional Forester W.R. Centerwall observed in 1941:

During the past six years, during which period the ranges of the Fort Apache Indian Reservation have been under close observation by the writer, the effect of Juniper and Pinyon Pine rangeland invasion has been very evident and pronounced. Thousands of acres of good grass-covered range land are being encroached upon, to the extent that within a short period of time they will become entirely useless insofar as forage resources are concerned.

Dr. Elliott also conducted more extensive tree-ring studies revealing that the vast majority of juniper trees had taken root since 1918. Again, this coincides with the heaviest grazing period on the reservation.

Defendant does not dispute that juniper encroachment has occurred on the reservation. Defendant also agreed, through Dr. Box, that "cessation of fire" and "heavy livestock grazing" are major contributing factors to juniper increase. Defendant instead argued that Dr. Elliott's analysis of causation ignores climatic variations. However, defendant offered insufficient evidence of its own to suggest that climate was the agent responsible for the spread of junipers across the reservation's rangeland. By comparison the cumulative weight of plaintiff's tree-ring data, historic observations, and evidence of the difference in the timing of contemporaneous overgrazing and juniper spread between ranges on and off the reservation make plaintiff's evidence more persuasive.

The proofs do not answer a controlling factual question, however. Juniper occurs naturally in the region; in fact, it was present on the reservation before the onset of overgrazed conditions and key climatic events triggering destructive drought/flood episodes. Absent overgrazing, it is likely that climate would have caused conditions conducive to the infestation of juniper. On the other hand, overgrazing predisposed the affected range to the spread of juniper. Just as the Government must bear responsibility for erosion damages to the rangeland caused by overgrazing while the land was under its super-

vision, it must also be held liable for any loss in carrying capacity of the rangeland due to juniper infestation brought about by overgrazing and not climate. Plaintiff measures its loss by reduction in carrying capacity, irrespective of cause, *i.e.*, erosion caused by overgrazing or juniper infestation caused by overgrazing. Accordingly, adjustments to account for the effect of climate on Dr. Elliott's carrying-capacity analysis allow for the role of climate in creating the conditions amenable to juniper infestation.

Plaintiff also argues that government efforts to remove juniper from the rangeland actually aggravated the situation by making the soil around uprooted junipers hospitable to juniper seeds. According to the 1949 Annual Report, the first juniper eradication on the reservation occurred in 1939 when Civilian Conservation Corps ("CCC") crews cleared approximately 200 acres in the Cedar Creek area by hand-chopping and some tractor work. In 1941 W.R. Centerwall, Associate Regional Forester, proposed that a juniper eradication program be studied and undertaken on the Grasshopper Range. Funding for the small CCC projects ended during World War II. After the war, programs were begun by the Indians using tribal funds with Government assistance and encouragement, according to the 1947 Annual Report. As of 1947 it was reported that 650 acres were controlled. Plaintiff has not shown by a preponderance of evidence that the juniper eradication program begun (whether or not completed) prior to August 13, 1946, added to the infestation in respect of the 650 acres, even assuming that plaintiff could have identified adequately the treated area.

### B. *Claims for fraudulent mismanagement*

▮ Overarching all of plaintiff's claims concerning alleged government mismanagement of the range resources is its claim that each and every aspect of the Government's supervision of, and activities on, plaintiff's range was undertaken for the purpose of increasing the production of water flowing off the reservation for the benefit of the SRVWUA and other downstream users.

Examining first the possibility that the Government conducted the grazing permit program to increase the production of water, it is evident that plaintiff has not carried its burden of proof. Plaintiff made no showing that the government mismanagement that allowed the ranges to become overgrazed and eroded included any intent by the Government to increase streamflow to downstream users. The most plaintiff proved was an awareness by the Government of some of the consequences involved, including questions to be considered in any attempt to increase water production through manipulation of the vegetation. Plaintiff's argument draws heavily on a technical bulletin by Cooperrider and Sykes of the United States Forest Service, who stated in 1938:

> [I]t is apparent that methods for obtaining increases in water yield through destroying and even thinning and changing vegetation must be proved before they may be practiced with any degree of safety. Deterioration of vegetation is accompanied by deterioration of soils, and vegetation and soils cannot be replaced at will.... Although some increase of surface runoff may be obtained through general destruction of watershed vegetation, the possibility of increasing the total water yield through such means is very limited and is fraught with great dangers....

Such comments express a sense of caution against altering the vegetation rather than a plan to alter it. Moreover, the reaction by Superintendent Davis in 1924 upon observing an apparent increase in streamflow due to "the more denuded condition of the ranges on the sides of the mountains," weighs heavily against plaintiff's theory that the Government intended to exacerbate the situation to increase water production: "I intend to make still further reductions [in cattle] in some areas, largely with a view of overcoming the erosion during the flood seasons...."

Regarding plaintiff's contention that government-sponsored juniper eradication programs were also designed to increase water to the non-Indian downstream users, it is important to distinguish between those projects undertaken before 1946 and those occurring after 1946. As was outlined above, the pre–1946 juniper control projects funded by the CCC were small experimental attempts to recover grazing land from the encroachment of junipers. No mention was made in any of the documents discussing these projects that increased water production was the objective. There was nothing wrongful, in this sense, about these government projects. These efforts ended along with their funding during World War II.

### C. *Claims for continuing wrong*

■ Under the continuing wrong analysis discussed in conjunction with plaintiff's claims for mismanagement of water resources, any wrongful conduct found to have occurred after August 13, 1946, must have begun before that date and must have been continuous. *See Navajo Tribe of Indians,* 218 Ct.Cl. at 20, 586 F.2d at 198. The obstacle that prevents a finding of continuing wrong in the Government's management of grazing on the rangeland is that the Government's actions constituting mismanagement, *i.e.,* allowing overgrazing by permittees, had ended by 1946. The activities causing the loss in carrying capacity and erosion were the overstocking and overgrazing of the ranges. Plaintiff offered no proof that these activities continued beyond 1946. To the contrary, the evidence showed a large decrease in the number of permittee livestock between 1927 and 1928, and a gradual phasing out of the permit system through the 1930's and 1940's, until its elimination in 1953. By 1946 permittees were grazing only 1,250 livestock on the reservation. Plaintiff presented no evidence either that this number exceeded the carrying capacity for the permittee ranges or that the permittee livestock were overgrazing their ranges after 1946. Plaintiff did allege that erosion has continued from before 1946 into the

present. However, plaintiff's expert Mr. Kaczmarek stated that, based on his examination of aerial photographs taken in 1935 and in the 1980's, by 1935 the magnitude of erosion on the reservation essentially was the same as it is today. Both he and Dr. Elliott also testified that the carrying capacity of the range in 1946 was much the same as it is today.

■ Plaintiff similarly argued that the Government's juniper eradication program constituted a "continuing wrong," under the decision in *Navajo Tribe of Indians,* 218 Ct.Cl. at 20, 586 F.2d at 198, thereby escaping the jurisdictional bar. However, the central element of *Navajo Tribe of Indians'* three-part test for a continuing wrong is that any wrongful conduct by the Government must have been continuous, before and after August 13, 1946. Although the post–1946 eradication programs and the pre–1946 Government supervision of the grazing activities on the rangeland both affected the growth and extent of junipers, they were different activities. They lack the continuity necessary to overcome a congressionally-mandated time limitation on liability for government acts.

The more extensive juniper eradication program, which began in 1947 after the statutory cutoff date for acts compensable under the Indian Claims Commission Act, was funded jointly by the tribe and the Government. Its objective was the reclamation of grazing lands, not water production. However, later experimental projects clearly were conducted in part to measure the enhancement of water production that could be obtained by clearing junipers from areas in specific watersheds. Among these were the Corduroy Creek (1956), Cibecue Ridge (1959), and Cibecue (1960) experiments. The 1956 report, *Recovering Rainfall,* by George W. Barr of the Arizona Watershed Program, which plaintiff claimed inspired these projects, advocated both juniper removal from watersheds and careful studies of the effect on water yield. Although the SRVWUA advocated that juniper be eradicated in order to yield more water, that fact does not equate to a find-

ing that these three experimental projects manifested government exploitation of the range for water. Removal of the infestation was itself a legitimate objective, as urged by Tribal Chairman Lester Oliver in 1955, and the results regarding enhancement of water yield were inconclusive. The pre–1946 projects did not constitute "wrongful conduct," in that enhanced water production was not their objective. The post–1946 projects are discontinuous from the earlier ones.

Moreover, the incipient cause of the encroachment was overgrazing, but the overgrazing had ended by 1946. The delay in adjudicating these claims makes impossible the determination of the extent to which the Government must bear responsibility for juniper infestation. Climate played a role in creating the conditions that made the range susceptible to juniper encroachment. The evidence does not show that it would have occurred absent overgrazing, nor does it show that absent the effects of climate juniper infestation would have occurred to the extent reported in 1946. There is no justification in the record to attribute the entire juniper infestation to overgrazing or to find overgrazing as a causative agent beyond its discontinuance. Therefore, any harm that may have been caused to the rangeland by Government-sponsored juniper eradication programs is beyond the jurisdiction of this court to consider further.

Having found no continuing wrong to exist with respect to any of the claims for mismanagement of the range resources, the court will analyze damages only for liability predicated on Government activities occurring before August 13, 1946.

### D. *Damages*

Both parties developed and presented proofs on the measure of damages for the range resources. At the court's direction, they also presented revised versions of some of their damage calculations. Not surprisingly, the parties differed substantially in their preferred measures of damages, amounts of damages, and assump-

tions underlying their calculations. Neither side was able to persuade the court to adopt its measure of damages in its entirety, because both presentations suffered to some extent from shortcomings in their underlying assumptions. In its attempt to arrive at a proper measure of damages, the court has carefully analyzed both parties' presentations and has drawn heavily from each. " '[T]he fact finder is not required to choose between swallowing an expert's report whole, or rejecting it utterly, and usually, neither course is right.' " *Seminole Indians of State of Florida v. United States,* 197 Ct.Cl. 350, 361, 455 F.2d 539, 545 (1972) (concurring op.) (quoted in *Navajo Tribe of Indians,* 9 Cl.Ct. at 391). This section will explain the various measures of damages that each party sought to prove and will note the reasons why the court finds each method insufficient to some degree.

The greatest difficulty hampering a precise calculation of damages is the historical nature of the claims. Because events and conditions occurring on the reservation's rangeland over periods of time dating back 100 years could not be described by percipient witnesses, the parties and the court have had to rely largely on information contained in historical documents. Except for present-day inspections of, and a few experiments conducted on, the rangeland by expert witnesses, these witnesses have had to base their analyses and conclusions on observations, estimates, and data contained in the historical documents. For those events and conditions long ago, the documents are the best evidence available. Yet they are often incomplete and provide less information than would be necessary to establish damages with precision.

Recognizing the handicap placed on the parties in their damage presentations, the court has attempted to choose from among the methods and analyses and used those aspects of each which engender the most confidence. In effect, the final amount will be the product of what is known as a "jury verdict." This type of generalized view of damages, which draws upon some of the

parties' presentations to reach a final sum in much the way a jury would, is an accepted method under the law of this court in such circumstances, *see Navajo Tribe of Indians v. United States*, 9 Cl.Ct. at 429, 439–40; *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 736–37 (1984), and has been approved by the Federal Circuit in *Branning v. United States*, 784 F.2d 361, 364 (Fed.Cir.1986) (taking case). The rationale for jury verdicts can be found in the " 'settled principle that where the fact of damage has been established, absolute certainty or precise mathematical accuracy as to the amount of damages is not necessary.' " *Petrovich v. United States*, 190 Ct.Cl. 760, 766, 421 F.2d 1364, 1367 (1970) (quoting *Dale Construction Co. v. United States*, 168 Ct.Cl. 692, 729 (1964)).

Both in its Summary of Damages filed on March 21, 1986, and at trial, plaintiff sought to prove damages for the rangeland first by a "cost of restoration" method. Under this proposed method, the Government would be required to pay an amount equal to the cost of restoring the soil resources of the entire range, including removing all juniper, regarding the land, and reseeding the grasses. Plaintiff's experts calculated a total figure in excess of $230 million. However, an order granting in part defendant's motion *in limine* on water and range claims excluded the section of plaintiff's Summary of Damages dealing with the cost of restoration. *White Mountain Apache Tribe v. United States*, 10 Cl.Ct. at 118. As more fully explained in that order, the established measure of recovery recognizes diminution in market value as the proper measure of damages if the cost of restoration exceeds the diminution in market value of the rangeland. *Id.* at 117–18. The central remaining damages issue to be determined is how best to measure that diminution in market value.

To this effort plaintiff's expert Mr. Wicks substantially contributed by establishing that diminution in value based on market value of a piece of property is an unworkable method to value an Indian reservation. Among the factors unique to valuing a reservation as a piece of proper-

ty, in Mr. Wicks' view, are that discrimination distorts the value of the property and that valuing a piece of property with its highest and best use as a reservation does not have meaning in the commercial world. Finding comparable properties would be almost impossible. Mr. Wicks therefore used the income approach to measure market value. Because he has used this method in his real-world appraisals of Indian reservations, the court deems it reliable.

Plaintiff chose to calculate diminution in market value by hypothesizing a cattle-raising business large enough to utilize exactly the carrying capacity of the entire rangeland of the reservation in its pristine condition. Although Indians on the reservation have been raising and selling cattle throughout this century, there is no evidence that plaintiff as a tribe could or would have managed a venture of the magnitude postulated. In fact, the tribal herd, as it was called, was used to stock the herds of individual Indians. The amount of initial stocking for the tribal herd in Dr. Elliott's damage calculations was hypothetical. Also, it is far from certain whether the tribe had sufficient revenues to launch this enterprise.

In Dr. Elliott's view, adding together the revenue from beef sales and earnings from labor that would have been generated by fully occupying the rangeland yielded a hypothetical "stream of income" that represents the diminution in market value. Plaintiff later recalculated the damages to include only the projected beef sales, after defendant pointed out that potential earnings from labor were individual not tribal revenues.

Dr. Elliott calculated diminution in carrying capacity for plaintiff. Using a combination of Soil Conservation Survey ("SCS") soil maps and range survey results from Mr. Kaczmarek, Dr. Elliott developed a range site map of the reservation. He then sampled what he considered to be representative sites to determine the range condition on each site. From this data Dr. Elliott calculated both existing and poten-

tial carrying capacity in pristine condition (based on 85 percent of climax vegetation) for each site. His final figures showed the carrying capacity of the entire reservation to have decreased from 40,874 AU's to 17,997 AU's, for a diminution of 22,877 AU's. Defendant attempted to challenge Dr. Elliott's range sampling methodology, suggesting that substantial acres of the reservation were omitted. However, Dr. Elliott testified that his sampling sites were representative of the entire reservation. Defendant also suggested that 31,000 AU's was a more accurate estimate of the carrying capacity before overgrazing; yet defendant's expert Dr. Box admitted that 31,000 was only indicative of a broad, estimated range of what the carrying capacity might have been. The court notes that Dr. Elliott's analysis was his first of this type and Dr. Box credibly explained that accepted range management practice does not strive for rangeland in a near pristine state. Nonetheless, since defendant presented less justification for its figures than did plaintiff for its own, and since estimated carrying capacity appears to have varied greatly throughout the years, plaintiff's figures on carrying capacity will be accepted as the more reliable.

Mr. Kaczmarek presented damage calculations, supported by Mr. Wicks, for the hypothetical cattle operation by capitalizing potential profits over time to arrive at alternate present worth values of $7,965,360 and $7,416,414—the latter value premised on an assumption of Indian responsibility for 50 percent of the damage to the Indian Range. Two significant problems with this proposed measure of damages require that it be rejected. First, the damages calculated represent lost profits for an unestablished business. This is also the key flaw in Dr. Elliott's damage study. As the court ruled previously on this issue, "The likelihood of profits from a new venture is too uncertain for loss of anticipated profits to form a reliable measure of the damage suffered." *White Mountain Apache Tribe*, 10 Cl.Ct. at 118. Second, plaintiff did not justify sufficiently its categorization of land into Indian Range and permit-

tee ranges, given that some land changed from one status to another at various times.

Defendant, through Dr. John P. Workman, an expert in appraisal and range management, also proposed measures of damages. The court deems Dr. Workman's testimony especially persuasive. Range management was not a claim wherein one party proved its entitlement to everything it wanted. Plaintiff sought maximum recovery on the theory that defendant would be held responsible for all the erosional damage to its reservation. Defendant took the position that, even assuming liability for some unspecified damage, plaintiff suffered no damages because the grazing revenues offset the damage that obtaining them caused. What Dr. Workman brought to the stand was the flexibility to adjust his calculated variables. His adjustments compensated for the fact that no one could ever know in a case tried more than 60 years after the peak overgrazing how much of plaintiff's rangeland was damaged by overgrazing independent of climate.

Dr. Workman made three sets of calculations, which he later modified at trial at the court's request in order to incorporate certain assumptions and data more favorable to plaintiff. The court deems these adjustments warranted by its findings on liability, *i.e.*, plaintiff was not responsible for wild horses and ponies. In essence, defendant's main approach had been to use the calculated potential carrying capacity of approximately 41,000 AU's to produce two figures: 1) the difference between the amount actually realized from grazing permits (plus value to Indian cattle grazed on the ranges) and the amount that could have been realized by leasing all ranges up to their potential carrying capacity; and 2) the capitalized value of the portion of potential grazing fees representing the diminution of carrying capacity in 1946. The sum of these figures represented the net benefit or loss to plaintiff, as measured by the potential lease of all grazing lands to

non-Indian livestock owners.[21]  Dr. Work-man's method yielded modest damage figures, in part, because the revenue to plaintiff from the permit program was offset against the value of the damage to the ranges from that program.

This method contrasted sharply with the two other approaches presented by Dr. Workman.  The second method was a recalculation of plaintiff's hypothetical cattle operation, which already has been rejected because of the uncertainty involved in assuming both the existence of a large tribal herd and speculative profits.  He calculated profit for head of cattle run, not sold, which was a low figure because the Indians consumed a lot of the livestock.  This analysis netted plaintiff $15,750 and is rejected because the price per head is artificially low.  The third method was one that Dr. Workman deemed a "worst case scenario."  It allowed plaintiff the benefit of several assumptions (1) by adopting: a) 1898 as the starting date for reduced carrying capacity; b) a carrying capacity reduction from 41,000 to 19,000 AU's; c) $3.00 per AU as the potential leasing value for all years; and (2) by ignoring as offsets all benefits the tribe derived from overgrazing *i.e.,* permit revenue and grazing value to Indian cattle.  Under this method damages totaled $4,950,000.  This method is unacceptable because it has the effect of overcompensation.  It compensates plaintiff fully for all harm caused by the overgrazing, yet makes no deduction for the benefits through grazing fees that plaintiff received from overgrazing.  Nevertheless, this method is useful in the court's jury verdict determination of damages.  It represents an upper limit on damages because it is structured as the scenario most favorable to plaintiff.

The most reasonable starting point for developing a jury verdict amount is Dr. Workman's first revised method, DX H–1, table 7a.  That method began with a poten-tial grazing value of $2,997,000, reduced by the actual permit revenues received of $1,520,000, which totaled $1,477,000.  Added to that figure was the capitalized amount of the reduced range value, or $1,650,000, yielding a total damage figure of $3,127,000.  This formulation is favorable to plaintiff in that it omits any reduction for the grazing value to Indian cattle.[22]  It also adopts plaintiff's carrying capacity figures which the court found acceptable, for pristine (41,000 AU's) condition.  The present/1946 condition is 19,000 AU's, reflecting an upward adjustment of 2,000 AU's, a less significant reduction in carrying capacity than urged by Dr. Elliott.  In the court's view, this adjustment compensates for the influence of climate as a cause of erosion.

The adjustments in the data that are beneficial to plaintiff are weighed against defendant's insistence on using historical grazing fee figures in its calculation of potential grazing value.  Defendant's figures, intended to represent the price at which the land could be leased for grazing when stocked to its pristine carrying capacity, are instead the actual prices at which the land was leased in its often overstocked and overgrazed condition.  Therefore, the grazing fee numbers used yield a potential grazing value that is too low.  It is difficult, perhaps impossible, to know what value the reservation's rangeland would have brought in permit fees each year had it not been overgrazed.  The court has compensated for this understatement by adding $500,000 to Dr. Workman's final figure.

Such difficulties, when unresolved by the parties' damages proofs, highlight the utility of using a jury verdict amount of damages.  It becomes a means for achieving a result that is fair and just to both parties when neither party has been able to present an independently complete or acceptable measure of damages.  On this basis the court determines that the amount of

---

21.  Dr. Workman testified that leasing the grazing land to livestock owners yields a higher value than grazing one's own cattle or using the land for hay production.

22.  It also properly omitted any reduction for wild horses, which were determined in the liability section not to be the responsibility of the Indians.

damages for plaintiff's rangeland to be $3,627,000.

III. *Claims for mismanagement of timber resources*

Plaintiff's third set of claims focuses on the Government's management of the timber resources on the reservation. Plaintiff alleges that sections of the forest harvested for timber since 1918 were overcut, resulting in a loss of growth in the trees during the years since the cuts and for future years. Plaintiff also made claims for the value of timber harvested and used by the U.S. Army between 1870–1917; for the value of timber cut by the BIA and processed through government-owned and private sawmills; for the Government's handling of forest fires; and for the Government's practice of prescribed burning of natural debris on the forest floor. In addition, plaintiff claims that by overcutting the forest, the Government both forced the Indian-owned Fort Apache Timber Company ("FATCO"—the acronym used by plaintiff) to expand its sawmill facilities and created the preconditions for future reductions in employment income to tribal members when future harvests are reduced to compensate for earlier overcutting. Finally, plaintiff claims that the Government's entire forest management scheme and practices throughout the history of the reservation was motivated by the desire to increase the streamflow from the reservation.

The reservation is forested over 1,061,000 of its acres, more than 685,000 acres of which are commercial forest. The commercial forest covers the northern and eastern regions of the reservation and spans altitudes from 6,000 feet above sea level to the timberline at 10,000–11,000 feet. The forest currently serves multiple land-use objectives, from recreation, water, and wildlife to grazing and timber. In terms of direct revenue production for the tribe, timber harvesting is the predominant use. The primary species harvested is the ponderosa pine. This type of tree ordinarily does not become of merchantable quality for lumber until it reaches the age of 130–150

years. At younger ages its only harvestable value is as pulpwood.

Timber has been harvested on the reservation since the Army began cutting trees in the 1870's around Fort Apache to supply timber for a sawmill located near the Fort Apache Agency. From the date of the establishment of the Fort Apache Indian Reservation as a separate reservation in 1897 through 1908, neither the Government nor the tribe undertook any efforts to harvest the timber resources on a larger scale. In January 1908 the Forest Service became responsible for Indian timberlands under a cooperative agreement with the BIA. This arrangement lasted until July 1909. By executive order, President Roosevelt transferred the reservation's forest lands to the adjacent Sitgreaves and Apache National Forests in March 1909. The Forest Service administered these annexed portions until 1912 when the earlier executive order was rescinded.

Beginning in 1918 with the Unit One sale ("Unit One"), the BIA and tribe contracted with outside timber companies to cut several large areas of the forest. The BIA developed the first Management Plan for the reservation's forest in 1944 and has written new Management Plans at various intervals since then. Throughout this time both silvicultural practices and timber harvesting methods have undergone considerable changes. For example, early timber cutting was planned according to the "working circle" method by which timber was cut in a radius around a small sawmill, and the sawmill was moved to the next location when the timber within easy reach was exhausted. Later cuts were accomplished under the "railroad logging" method. A railroad was constructed into the forest while areas adjacent to it were cut. The timber company would remove the tracks upon completion of the cut. Timber companies conduct modern harvests by "truck logging" in which they cut logging roads into the forest and transport the logs by trucks to sawmills offsite.

A small tribal sawmill and planing mill, originally operated by the Indian Service,

had processed part of the timber harvested from the reservation until 1947 when a fire destroyed the sawmill portion. In 1961 FATCO was established and began construction of a sawmill at Whiteriver which began operating in early 1963. Capital expenditures at the sawmill continuously expanded its operating capacity between 1963 and 1985. Today FATCO processes virtually the entire harvest of the reservation and is also the largest employer of tribal members.

A. *Liability (pre-1946) and damages other than for the Unit One overcut*

1. To comprehend fully the Government's role in managing plaintiff's forest, it is useful to examine first the sources and extent of the Government's duties regarding Indian forests. The obligation to manage Indian timber resources is rooted in a series of statutes and regulations that began with the Act of June 25, 1910, ch. 431, §§ 7, 8, 36 Stat. 855, 857, *as amended*, 25 U.S.C. §§ 406, 407 (1982) (the "1910 Act"), which first authorized the Secretary of the Interior to sell timber on unallotted lands and apply the proceeds for the benefit of the Indians. In 1911 the Department of Interior's Office of Indian Affairs promulgated detailed regulations covering its responsibilities in "managing the Indian forests so as to obtain the greatest revenue for the Indians consistent with a proper protection and improvement of the forests." United States Office of Indian Affairs, Regulations and Instructions for Officers in Charge of Forests on Indian Reservations 4 (1911) (the "1911 regulations"). These regulations included the following provisions:

> Section 4.— It shall be the duty of the Indian police to prevent and suppress forest and grass fires as far as possible....
>
> ....
>
> Section 10.— ... Extensive clear cutting should be permitted only where the land will be utilized for agricultural purposes....
>
> ....

> Section 27.— The general minimum diameter limits to which trees will be cut as stipulated in the contract ... upon lands which are to be kept as timber lands should be such as to leave sufficient seed trees in all cases, and in most instances such as to leave 20 to 30 percent of the merchantable stand as a basis for future timber crops.

*Id.* at 5–19. The regulations were revised in 1918; however, the sections quoted above were reissued without change. The Supreme Court in *Mitchell* explained the next step in the evolution of what today is a comprehensive federal regulation of Indian Forests:

> Over time, deficiencies in the Interior Department's performance of its responsibilities became apparent. Accordingly, as part of the Indian Reorganization Act of 1934, 48 Stat. 984, Congress imposed even stricter duties upon the Government with respect to Indian timber management. In § 6 of the Act, now codified as 25 U.S.C. § 466, Congress expressly directed that the Interior Department manage Indian forest resources "on the principle of sustained-yield management." Representative Howard, co-sponsor of the Act, and Chairman of the House Committee on Indian Affairs, explained that the purpose of the provision was "to assure a proper and permanent management of the Indian forest" under modern sustained-yield methods so as to "assure that the Indian forests will be permanently productive and will yield continuous revenues to the tribes." 78 Cong. Rec. 11730 (1934).

463 U.S. at 220–21, 103 S.Ct. at 2969–70.

The 1936 regulations promulgated under the Indian Reorganization Act of 1934 required the following:

> (a) The preservation of Indian forest lands in a perpetually productive state by providing effective protection, preventing clear cutting of large contiguous areas, and making adequate provision for new forest growth when the mature timber is removed.

(b) The regulation of the cut in a manner which will insure [sic] method and order in the harvesting of the tree capital, so as to make possible continuous production and a perpetual forest business.

United States Office of Indian Affairs, General Forest Regulations 1 (1936). The regulations also addressed the extent of a permissible cut: "Whenever practicable, from 25 to 60 percent of the merchantable timber volume will be left standing in order to protect the site, provide seed for a new stand, and make possible a second cut before the reproduction matures." *Id.* at 2. The regulations further required the development of working plans for all major reservation forests in order to implement sustained yield forest management. *Id.* It is clear that sustained yield management became not merely an objective, but an absolute requirement in all timber sales or cuts after 1934, and the 1936 regulations reemphasized this: "[N]o Indian timber may be developed either by Indians or by white men, unless it is operated on a sustained yield basis." *Id.* at 4.

The 1964 amendments to the 1910 Act again emphasized the Secretary's timber management duties. *See* 25 U.S.C. §§ 406, 407.

The aggregate effect of such detailed and comprehensive government regulation is to "give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They thereby establish a fiduciary relationship and define the contours of the United States' fiduciary responsibilities." *Mitchell*, 463 U.S. at 224, 103 S.Ct. at 2971; *see White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 145, 147, 100 S.Ct. 2578, 2584, 2585, 65 L.Ed.2d 665 (1980). Moreover, "[g]iven the existence of a trust relationship, it naturally follows that the Government should be liable in damages for breaches of its fiduciary duties." *Mitchell*, 463 U.S. at 226, 103 S.Ct. at 2972.

In evaluating whether the Government's actions amount to a breach of fiduciary duty, it is important to remember that the responsibility of prudent management does not make [the Government] a guarantor or insurer. Further, the government's action cannot be evaluated under present standards but rather must be examined in light of the information and resources available and perceived options present at or during the relevant time.

*Navajo Tribe of Indians,* 9 Cl.Ct. at 407. Nevertheless, Government conduct that represents a significant departure from the explicit language or underlying intent of statutes and regulations specifying Indian forest management duties can form the basis of a breach of the Government's fiduciary duty.

Several terms and one concept should be defined. "Silviculture," according to M. Deene Stowell, an expert forester who testified for plaintiff and who served as the forester and logging manager for FATCO from 1968–1972, is the science and art of managing a stand of timber for a given product. John Philbin, one of defendant's expert foresters who has been a career BIA forester since 1974, defined silviculture as the mechanics of density control on a stand. Harmonizing these definitions highlights the key concept of regulating the number of trees in a stand consistent with optimum growth and productivity. The concept of "sustained yield" is a technique of silviculture. When a forest is managed on a sustained-yield basis, the amount to be harvested each year will equal the annual net growth of the forest. Since net growth in a virgin forest is either zero or negative (because the land is fully stocked, and any gross growth is equalled or exceeded by mortality), the concept of sustained yield has little meaning until the forest is regulated. A forest becomes regulated by controlling the volume of growing stock in the forest. It may require more than one cut over many years before a forest becomes regulated.

Commercial timber is measured in board feet ("BF") by the thousand, *i.e.,* 1,000 BF equal 1 "MBF"; 1,000 MBF denotes 1,000,000 BF. Measurements to calculate

growth for sustained-yield purposes use MBF per acre.

2. Plaintiff charged that the Government sought to protect the forest from exploitation when the prevailing view was that the forest effectively stored water for eventual release to downstream users and that the Government then later began overcutting plaintiff's timber when the potential became known for increasing runoff by harvesting timber. This impermissible management objective is traced by plaintiff to the transfer of plaintiff's forest to the adjacent national forests between 1909–1912. The court has reviewed the historical documentary evidence concerning the transfer and finds that its motivation was to protect the watershed to the Salt River Federal Reclamation Project and to put the forest, over the vigorous objections of the BIA, under the Forest Service, which at that time was considered more capable of managing forests as national resources. Of course, the reservation's forest was plaintiff's resource, not the nation's, and the transfer was rescinded. Defense historian Dr. Angel amassed most of the pertinent historical documents and presented an analysis critical of this episode. The candor of his testimony should be acknowledged. The reigning conservationist theory—protection of the forest to protect watersheds in the arid Southwest—did not excuse the annexation of plaintiff's forest. However, plaintiff did not claim damages traceable to this action, but cited it as but one manifestation of defendant's policy to manage the reservation's forest for the production of water. It is found that the transfer represents an instance of mismanagement; however, as will be discussed, the evidence does not show that other instances occurred before August 13, 1946, that could be described as fraudulent management of the forest for the production of water.[23]

3. Plaintiff alleged that timber sales planned or cut before August 13, 1946, had the effect of overcutting the forest. The first part of the forest that plaintiff alleges was overcut is an area in the northeastern portion of the reservation that the Government contracted to be cut as the Unit One sale. The Secretary of the Interior approved the sale in January 1918 and cutting began later that year. The three successive timber companies (Apache Lumber Co., Cady Lumber Corp., and Southwest Lumber Mills) that operated under the contract all conducted their logging of Unit One by the railroad logging method. Between 1918 and the completion of the Unit One cut in 1939, the volume of timber harvested from the area totalled 490,380,-590 BF. In all, 52,480 acres were cut, yielding an average cut of 9,344 BF per acre. That much is known for certain about the Unit One harvest.

The issues in dispute are 1) what percentage of the timber volume standing on Unit One sites was cut? and 2) was the extent of the cut in accordance with the silvicultural practices that would be expected of a prudent trustee at that time under the applicable Indian forest statutes and regulations? Mr. Stowell testified that based on a study he conducted in 1984 on Unit One sites, the extent of the original volume cut during the harvest was 88 percent. On cross-examination, however, the Government raised doubts about whether Mr. Stowell's study sites were actually representative of the Unit One area. Although precise contemporaneous data on the volume retained per acre is not available, plaintiff presented a 1937 Forest Service document that estimated that the Unit One stand would average 1,700 BF per acre retained volume when the cut was completed.

Defendant's second expert in forestry, professional forester J. Russell Mast, the BIA's former Forest Manager on the reservation from 1966–1985, admitted that early (1918–1932) cutting had been heavy, leaving only 1,512 BF per acre on stands that comprised 72 percent of the Unit One area. The remaining 28 percent of Unit One's

---

**23.** Plaintiff posits that the Unit One overcut signaled the change from the theory that the forest should be conserved for watershed protection for the benefit of the downstream users to the theory that the forest should be overcut to maximize runoff for the downstream users.

area was cut between 1933 and 1939, and, according to Mr. Mast, contained 6,835 BF per acre after cutting. Mr. Mast's weighted average for the entire Unit One residual volume was 3,002 BF per acre.

Although these figures for retained volume vary considerably, they all indicate that a very high percentage of the timber volume originally on Unit One was removed, apparently more than 75 percent. Plaintiff's contention that this constituted an overcutting of the area is supported by several observations. First, a 1917 document entitled "Forest Description and Sale Report for a Proposed Sale on the Sitgreaves National Forest and the White Mountain Indian Reservation" (Unit One) indicates that 66⅔ percent was the standard Forest Service volume cut percentage. *Id.* at 7.[24]

Second, plaintiff's second expert in forestry, professional forester William M. Beaty, testified that, given the costs involved in railroad logging and the history or experience of lumber companies at that time, Unit One should have been cut at a lighter rate "somewhere between 50 and 66 percent." Mr. Beaty stated that conducting the harvest at that rate would have been economically feasible, as well, particularly if the area cut had been extended slightly to compensate for a lower volume cut per acre. Mr. Beaty's experience in working on national forests and managing private forests lends credibility to his testimony. The court found his candid, forthright, and careful testimony to be easily the most credible expert testimony concerning the Unit One sale. The opinion of Dr. Robert P. Latham, defendant's expert professional forester and resource economist, that Unit One was cut consistent with prudent management, was not deemed as sound as Mr. Beaty's due primarily to the latter's experience in managing private for-

ests and over 40 years' work as a government and independent forester. Dr. Latham's expertise proved more impressive on the damage issues to which he brought his background in resource economics to bear.

Third, the court's site inspection of the Unit One area revealed a forest cut too heavily in the past. Some areas that were clearcut (and not affected by forest fires) still lie bare or have only thin stands of young pine trees. Others contain dense stands of young trees all about the same age, which may require either that substantial thinning be done soon to allow later generations of trees to seed in, or that these crowded and slower-growing even-age stands be once again clearcut upon reaching commercial maturity.

Fourth, defendant's reliance on data tabulated in the BIA's 1954 Management Plan for the reservation as indicating that the residual volume noted as of 1953 is inconsistent with overcutting was contradicted by the document itself. Harry R. Kallander, the BIA Forest Manager who authored the 1954 Management Plan, noted that residual volume per acre on Unit One as of December 1, 1953, was 5,400 BF. This figure does not represent what was left as of 1939 when the Unit One cut was completed.

■■■ Given the cumulative weight of plaintiff's evidence, the Government's witness' own admissions, and the court's on-site observations, it must be concluded that the railroad logging and clearcutting methods of timber harvest on Unit One cut the forest at a higher rate than a prudent trustee should have during the relevant time period. Although the Government's duty to adhere to sustained-yield management practices did not become explicit until 1934, admonishments against clearcutting appeared in the 1911 regulations. These

---

**24.** Even though the Government noted that this document also revealed the Forest Service's intention to contract for a 75–80 percent cut on the Sitgreaves National Forest portion of Unit One, Forest Description and Sale Report at 21, 22, it appears that this was not indicative of the Forest Service's general policy. Rather, it was

done both as an accommodation to the Indian Service, which was planning to mark its portion of Unit One for a 75 percent cut, and as a justification for "the increases in railroad investment and in logging investment called for at present" for the eventual contractor. *Id.* at 22.

regulations imposed on the Government a management responsibility to obtain revenue from Indian forests, but they also demanded that the revenue be obtained in a manner "consistent with a proper protection and improvement of the forests." 1911 regulations at 4.

The Government had a dual obligation: to obtain revenue from the forest and to protect the forest. To neglect or minimize the latter in performance of the former would amount to a breach of fiduciary duty. Even though clearcutting in conjunction with the railroad method of logging may have been commonplace on privately-owned forests in the early part of this century, the Government must be held to the higher duty of a trustee tempered by the conditions at the time the Government permitted the cut. *See Navajo Tribe of Indians,* 9 Cl.Ct. at 400, 407. Mr. Beaty's testimony was compelling that hindsight does not render the Government's actions inappropriate in the circumstances; rather, as the witness testified, given the practices of harvesting timber that then were known during the period of the Unit One cut, the Government could, and should, have cut less timber or spread the cut out over a greater area, which would have yielded an economically profitable return with the same capital investment. Therefore, instances of clearcutting or excessive harvesting, such as occurred on Unit One, constitute a breach of the trustee's fiduciary duty, especially when measured against the specific directives of the applicable regulations for Indian forests. *See Menominee Tribe of Indians v. United States,* 117 Ct.Cl. 442, 499, 508, 91 F.Supp. 917, 927, 933 (1950). The Government consequently must bear the liability for overcutting Unit One. The amount of the overcut will be considered below as an element of damages.

4. Plaintiff claimed that several other areas that were cut or contracted for cutting before August 13, 1946, also suffered from overcutting. These areas included the following timber sales and harvest dates: North Fork (1938–1946); Smith Park-Horse Mesa (1938–1947); Maverick

(1946–1966); Big Cienega (1945–1946); Badger Creek (1945–1946); North Boundary (1936–1940); Red Lake (1944–1947); Walnut Canyon (1946–1951); and Hop Canyon (1941–1949).

■ Plaintiff presented voluminous exhibits and testimony concerning both the Unit One cut and plaintiff's claim for fraudulent mismanagement of its timber for the production of water. The latter claim was an instance in which the summarization of data and lengthy analyses presented by way of expert witness' reports greatly aided the court's understanding of the issues, although plaintiff may not have prevailed with respect to them. However, in attempting to prove its allegations of pre–1946 overcutting beyond Unit One, plaintiff chose to rely merely on conclusory statements about overcutting in its expert reports and on timber volume statistics that list the amount cut under each sale, but not the residual volume or the percentage of pre-harvested volume that was cut. Only in the 1954 Forest Management Plan do the residual timber volume figures finally appear; but the residual volumes for each sale are estimates of the volume existing as of 1953, which necessarily includes growth on the stands since completion of the various harvests. In short, plaintiff failed to provide evidence that would show the extent of the alleged overcut on these other sales. Because plaintiff fell short on its burden of proof, the Government incurs no liability for the alleged overcutting of the remaining pre–1946 timber sales.

One of these timber sales, the Maverick Cut, deserves further comment. Plaintiff's expert Mr. Stowell did testify that the Maverick area had been cut at a rate of 64 percent, four percent over the contract estimate. Mr. Stowell attempted to substantiate this claim with statistics he developed from measurements he made on "cut-and-leave" plots at sites on the Maverick area. Even if the court were to accept Mr. Stowell's 64–percent figure as an accurate determination of the extent of the Maverick

cut, that harvest rate still falls within the range of cutting rates acceptable for prudent forest management at that time, according to plaintiff's expert Mr. Beaty, whose probity upheld plaintiff's claim for overcutting Unit One. Mr. Beaty testified that a harvest rate of 50 to 66 percent would have been prudent for the Unit One sale; and there is no evidence before the court to suggest that the same range of acceptability would not also apply to another pre–1946 sale, such as Maverick. Therefore, there is no Government liability for overcutting the Maverick sale area.

5. Plaintiff claims that overcutting between 1918 and 1986 resulted in the forced expansion by plaintiff of its sawmill capacity to keep pace with the timber harvested under BIA management. Plaintiff's witness Hal F. Butler, FATCO's former General Manager and current Sales Manager since 1964, particularized the claimed expenditure of $26 million to the expansion of FATCO facilities after 1968. Mr. Butler's testimony merits special recognition. He was an avid, interested witness committed to FATCO as an enterprise unhampered by what he views as less than enlightened BIA policies. The witness was one of the few percipient witnesses, and what his and other testimony revealed about Mr. Butler's role in FATCO's success should not be viewed as diminished by the inability of this lengthy opinion to discuss it more fully.

■ Although plaintiff predicates this claim on alleged overcutting from 1918 through 1986, the only overcutting found to have occurred was on Unit One, the sale and harvest of which was completed before 1946. FATCO built its sawmill and began operating in the years 1961 through 1963; and the expansion of the mill took place from 1968 onward. Even though plaintiff may sincerely believe that it was impelled to enlarge FATCO because of a 70–year regime of heavy cutting, the evidence does not bear this out. Plaintiff made no showing that the post–1968 expansion was a direct result of the Unit One overcut. Moreover, Mr. Butler testified that the expansion was encouraged, instead, by the increased AAC of 92,000 MBF contained in the 1968 Management Plan. Since the expansion of the sawmill was neither a direct consequence of pre–1946 overcutting, nor a necessary response to a continuing wrong, this claim must fail also.

■ 6. Plaintiff made two claims for timber harvested the Army. Plaintiff sought to recover the value of both fuel wood used by the Army during the 47 years (1870–1917) it occupied Fort Apache and lumber processed by the Army mill located near Fort Apache. The only evidence that plaintiff presented to verify the fuel wood claim was a reiteration by Mr. Stowell of the damages calculation for this claim. Mr. Stowell estimated the fuel wood volume to have been 1,000 cords per year, valued at $.50 per cord. Defendant introduced through Dr. Latham the 1910 Timber Report by District Forester George A. Gutches which contained a reference to the 1909 Army consumption of fuel wood of 2,500 cords. The report indicated that the Indians were paid $3.25 per cord for the fuel wood. Although defendant's document pertains only to a single year among the 47 for which plaintiff claims damages, plaintiff did not offer any evidence from which to determine the annual volumes of fuel wood used by the Army or to conclude that the Army did not pay for some or all of the wood. Nevertheless, to require plaintiff to establish the fact of non-payment for what resembles an accounting claim (in which the trustee ordinarily has a duty to account for funds held for the benefit of the beneficiary) would be an unreasonable demand for proof. The Government attempted to prove that it paid for the fuel wood. Its reported payment in 1909 is convincing; however, it cannot be inferred from a single year's payment that the Government paid for each of the 46 years. Therefore, the Government will be held liable for the 46 years worth of fuel wood at $.50 per cord and 2,500 cords per year, or $57,500.

■ Similarly, plaintiff claimed the value of 28,200 MBF allegedly cut by the

Army and processed by an Army sawmill over the 47–year term period. Mr. Stowell derived this volume from an estimated capacity of the mill. Again, however, plaintiff offered no further evidence to substantiate .either the actual amount cut or the allegation of non-payment. Defendant's expert Dr. Latham admitted in his report that some quantity was cut by the Army mill. He stated that a 1910 report by Superintendent Crouse gave a figure of 150,-000 BF annually. Unfortunately, no such report exists among either the Government's or plaintiff's exhibits. A 1910 timber report by District Forester Gutches lists the 1909 Army sawmill production as "50,000 feet of lumber, 30,000 shingles, and 3,000 lath." Given this evidence, it is safe to assume that the Government's estimate of 150,000 BF annually represents an upper limit on Army sawmill production. Since the Government was unable to prove payment for the value of the timber it gave to the Army for the sawmill, the Government will be liable for 150,000 BF annual production of the sawmill, for 47 years, at $2.00 per thousand BF, or $14,100.

7. Plaintiff also claims the stumpage value of timber processed by three major agency sawmills that both parties agreed were in operation between 1880 and 1947. The only issues in dispute were the volume of lumber processed and the portion of that lumber that might have been used by the agency for the benefit of plaintiff. Mr. Stowell testified for plaintiff that the sawmill at Roberts Ranch (later moved to Whiteriver) produced 200,000 BF annually over the 67–year period. The Government gave a more generous estimate of 837,000 BF annually, based on an average of reported figures for 16 of the 18 years between 1928 and 1947. Accepting the Government's figure as reasonable and adopting its $3.00 per thousand BF stumpage value over 67 years [25] yield a total value of $168,237. Dr. Latham estimated that a fair allocation of the use of timber processed by the agency sawmills might have been 80 percent for

the benefit of the Indians and 20 percent for agency use. Plaintiff's calculation assumes that none of the timber was used for the Indians' benefit. This seems an unreasonable assumption, given that the purpose of the Indian agency was to assist the Indians. Thus, if the Government's allocation is adopted, 20 percent of the value of the agency sawmill's production equals $33,647.

8. Plaintiff alleged BIA negligence in failure to respond to five district forest fires that occurred between 1924 and 1971. Plaintiff's expert report, Mismanagement of the Forest Resources and Damages, contains a tabular summary of the fire damage. However, the report gives no indication of the source(s) of information for the damage figures and fails to cite to any documentary evidence that might support its claim of negligence. Plaintiff could have provided such evidence by way of testimony at trial, but failed to do so. Mr. Stowell's testimony amounts to little more than the bare allegation of the amount of damages. Nevertheless, the Government rescued part of plaintiff's claim, through Dr. Latham, by admitting Government negligence in two 1924 fires—the Cooley and Cerro Gordo fires—and citing to one of plaintiff's exhibits that substantiates its negligence claims. That exhibit, a 1925 report from Forest Service District Forester Frank C.W. Pooler, complained of Indian Service indifference to and ineffectiveness in responding to forest fires during the previous year. In particular, the report estimated the total acreage burned during two of the fires to have been 700 acres from the Cooley fire and 1,200 acres from the Cerro Gordo fire. In light of this evidence, the Government will be held liable for the damages from those fires. The Government accepted plaintiff's figures of 1,700 BF per acre (volume) and $3.22 per thousand BF (stumpage rate). If these numbers are applied to a total area of 1900 acres burned, the amount of damages due

25. The Government premised its calculations on the 62–year period from 1885 to 1947, but gave no explanation of why it favored a period of

operation for the sawmills that is five years less than plaintiff alleged.

to the Government's mismanagement of forest fires is $10,400.

**B.** *Claims for fraudulent mismanagement*

1. Plaintiff's next claim is that in all aspects of its management of the forest the Government made the production of enhanced streamflow to the downstream users its overriding concern. The first manifestation of this objective, according to plaintiff, was the transfer in 1909 of its forest to adjacent national forests. The court has found that the motivation for that transaction, although consistent with conservationist theory at the time, was in derogation of plaintiff's rights to its forest. The evidence of what occurred on the reservation after 1912, however, does not support a finding that the reservation was managed for the production of water.

Plaintiff presented evidence through Mr. Watson purporting to show a temporal correlation between heightened levels of streamflow during the 1917–1925 period and the initial cutting phase on Unit One which began in 1918. Plaintiff also introduced BIA documents in which the author notes the impact that a proposed timber cut might have on, among other things, the water resources. For example, the section on water in the 1954 Management Plan includes the following:

> The west fork of Black River, tributaries such as Reservation, Pacheta, McDonald, Paddy and Bonito Creeks, as well as the White River, originate on the reservation around Mt. Ord and Mt. Baldy. These streams contribute a large part of the waters stored in the Salt River Valley Water Users Association's projects on Salt River, which is used for irrigation in the Salt River valley [sic]. Runoff during flood periods in the intermittent streams on the rest of the reservation is also important. Thus any practice that effects [sic] the runoff from the

reservation is vitally important to the Salt River Valley section of Arizona. *Id.* at 16. The author of the Plan, Forest Manager Kallander, went on to note a decline in water runoff during the previous 30 years; and he stated that observers attributed the decline to "the tremendous spread in recent decades of brush and juniper in the lower elevation grasslands and great increase in ponderosa pine seedling and sapling density in the coniferous forest belt which is the high water yield area." *Id.* at 17. Plaintiff would extract from the discussion of water yield the inference that the reservation's forest was managed to enhance the production of water. However, the BIA has been required since 1936 by regulation to assess its forest management practices with respect to runoff, as well as other resource values, such as scenic and recreational purposes. One of the stated purposes of the 1936 regulations was "[t]he management of the forest in such a manner as to retain its beneficial effect in regulating runoff and minimizing erosion." United States Office of Indian Affairs, General Forest Regulations 1 (1936).

In any event, a mere statistical correlation between increased streamflow and timber cutting activities is not sufficient to constitute a breach of the Government's fiduciary duty. Nor is the expression of concern by a BIA official for the effect of a timber cut on water resources. One would expect a prudent forest manager, in developing a forest management plan, to give some consideration to the impact upon other natural resources from a timber cut. Rather, to prove the sort of breach of fiduciary duty implicated in this claim, plaintiff must prove that the Secretary of the Interior or his agents conducted the Government's forest management activities with the express intention of enhancing the streamflow for the benefit of downstream users.[26]

**26.** The fact that the BIA contracts for timber harvest in watershed areas of the reservation, or that the BIA takes into consideration the effects that a particular timber cut might have on the proximate water resources (whether their quan-

tity or quality) does not imply an intent by the Government to manage the reservation's timber resources to enhance the streamflow to downstream users. In fact, plaintiff's expert witness Mr. Stowell admitted that since all of the reser-

The court has found that defendant is liable for overcutting in respect of the Unit One sale only. This finding was based on evidence that the trustee could have accomplished its objective under the 1911 regulations of obtaining "the greatest revenue" for plaintiff "consistent with a proper protection and improvement of the forest" by not cutting to the extent that occurred. The evidence does not imply that the motivation for the overcut was the production of water. The motivation for the extent of the cut, as revealed in historical documents, was to make a certain amount of money. The issue whether defendant could have achieved that objective with a lighter cut has been resolved against defendant. Even if hindsight analysis could imply another motivation for the Unit One cut, a proposition rejected by this court, plaintiff's witness Mr. Butler testified more currently that in his opinion Mr. Mast did not try to increase runoff from the reservation during his tenure as BIA Forest Manager on the reservation from 1966–1985.

2. Plaintiff's best effort to prove that the Government managed its forest with the express intent of enhancing streamflow was its attempt to link a 1965 document, the Wilm Report, which recommended means to increase timber harvest on the reservation to enhance the production of runoff into the Salt River, with the 1968 increase in annual allowable cut ("AAC") from 61,000 MBF to 92,000 MBF. Careful review of the Wilm Report, which was prepared for the BIA, reveals both a concern that any additional water produced by forest management activities be credited to the "tribal account" and a recognition that the "acreage which may be cut each year must, of course, be left to the economic judgments of the Tribal Council...." Dr. Wilm ultimately suggested an increase of the AAC for ponderosa pine from 50,000 MBF to 90,000 MBF.

Later, at a January 17, 1966 meeting to discuss pending water rights litigation, attended by BIA officials and representatives of the SRVWUA, Dr. Wilm reiterated his belief that additional water could be produced by increasing the AAC to 90,000 MBF. The minutes of that meeting indicate that preliminary reanalysis of the 1961 Forest Management Plan by the Government led it to believe that the AAC could be increased to 76,000 MBF or 89,700 MBF if additional species were cut. Plaintiff also submitted a May 23, 1966 draft calculation of a proposed AAC of 94,000 MBF. Finally, the 1968 Timber Management Plan, prepared by the reservation's forester Mr. Mast included an AAC of 92,000 MBF. The implication that plaintiff attempts to draw from this sequence of events is that Mr. Mast recommended the 92,000 MBF AAC in the 1968 Plan in response to the BIA's acceptance of Dr. Wilm's suggestions.

■ This theory fails for three reasons: First, although Dr. Wilm's report does recommend a substantial increase in the AAC to produce more water, it also acknowledges Indian water and timber rights, as noted above. Second, a June 25, 1965 letter from BIA Area Director W. Wade Head, attached to the Wilm Report, stated, as follows:

> The Wilm report makes certain recommendations pertaining to forest management policies to maximize stream flow on the Salt River drainage that are *not in accord* with Departmental policy. The Secretary is obligated to support and administer a timber cutting program which is consonant with the best known conservation practices for protecting the Indian timber resources and obtaining optimum multiple use of the natural resources.

(Emphasis in original.) This statement indicates a less than enthusiastic BIA reception of the Wilm Report's recommendations. Third, even assuming that a nefarious intent to enhance streamflow for downstream users to the detriment of plaintiff motivated Dr. Wilm's recommendation of a higher timber cut, Mr. Mast presented highly credible testimony that the Wilm

---

vation's forest (indeed, all of the reservation) is in watershed areas, no matter where timber was

cut on the reservation, it would, of necessity, have some impact on a watershed.

Report in no way influenced his increase of the AAC to 92,000 MBF. Mr. Mast stated that the increased AAC was not an implementation of the Wilm Report. Furthermore, Mr. Mast presented calculations showing that full implementation of the specific recommendations contained in the Wilm Report would have given a figure of 156,000 MBF for the AAC on the reservation of the several species of timber mentioned in the report—a far higher number than the 92,000 MBF ultimately included by Mr. Mast in the 1968 Management Plan. Mr. Mast concluded with a detailed explanation of the exact method he used in 1966 to calculate the new, higher AAC—a method based on projecting expected growth from recent forest inventory measurement plots. Since plaintiff failed to prove that the Government's management decisions concerning the reservation's forest were calculated to produce enhanced streamflow to the downstream users, the Government is not liable on this claim.

3. Even though the Government has committed no legal wrong after 1946 in setting the reservation's AAC, the general displeasure of plaintiff with the Government's management of the forest bears sufficiently on a litigated claim that it should be addressed. Throughout the 1950's and 1960's, the BIA dramatically increased the AAC. Although the Tribal Council must give its formal approval to periodic management plans, which usually change the AAC and set forth the areas to be cut, neither the Council nor FATCO currently has any role in helping to formulate the management plans. The paternalistic nature of the BIA's management of the forest is unfortunate. The primary tribal enterprise, FATCO, has demonstrated since its inception in 1961 the formidable ability of plaintiff and FATCO managers to run a sound commercial operation. FATCO returns several million dollars in profit to plaintiff each year. Yet, FATCO's sawmill production is almost entirely dependent on BIA management decisions concern-

ing the quantity and quality of timber to be cut.

Plaintiff's witness Mr. Butler, who managed FATCO from 1963 through the early 1980's, gave convincing testimony that described how FATCO had continually increased its production capacity to meet successive increases in the AAC, effectively subordinating its long-term business judgment to the BIA's periodic assessment of the desirable level of timber to harvest and process. Mr. Butler stated that FATCO had been profitable when it was processing 40,000 MBF before 1968, but that the mill's expansion to handle 92,000 MBF, although not reducing its current profitability, left FATCO in a precarious reliance on continued harvesting at the 92,000 MBF pace. If the BIA determines at some later date that the 92,000 MBF AAC needs to be reduced, FATCO will experience the economic consequences of a concomitant reduction in mill output.

Ultimately, the Government, as trustee, must balance its dual obligations to manage the forest according to the silvicultural principles specified by law and to generate revenue for the tribe from the forest. However, the Government should attempt to tailor its revenue-producing practices more closely to the long-term economic needs of plaintiff; and plaintiff demonstrated at trial an acute awareness that FATCO was its principal revenue producer and what FATCO needs to ensure its future profitability. The most obvious way to achieve this result is to include plaintiff and FATCO to a significant degree in the planning stages of the BIA's forest management. This suggestion is, of course, only an exhortation from the court; but the fact that the court is not empowered to alter directly the BIA's forest management practices in no way lessens the necessity for greater cooperation among the BIA, plaintiff, and FATCO.

4. Plaintiff also objected to the BIA's use of a forest management technique known as "prescribed burning." This procedure involves the deliberate burning of dead logs, branches, grass, and duff [27] on

27. Duff is "the [natural] forest litter and other

organic debris in various stages of decomposi-

the forest floor. The purpose of prescribed burning is twofold: It removes potential fuel for forest fires from the forest floor, thereby reducing the risk of more serious fires from the forest floor that might climb to and spread along the crowns of trees; and it is used as a crude method of thinning the forest and removing lower branches that lessen the merchantability of the later-harvested sawlogs.

Plaintiff made no direct claim for damage to the forest from this practice. Plaintiff never fully elaborated its line of reasoning regarding its prescribed burning evidence, but it appears to be a facet of plaintiff's fraudulent mismanagement claims. Viewed in this light, plaintiff's theory would imply that prescribed burning was not a widely accepted forest management technique; that the BIA used prescribed burning to generate increased runoff for the benefit of downstream users; that prescribed burning damaged trees in the areas treated; and that the improper use of this technique caused damage to the forest that is subsumed under plaintiff's claim for loss of growth.

█ Even though plaintiff submitted evidence of a 1954 proposed study of the effect on water yield from the prescribed burning of forest land on the reservation, this claim must be rejected. Plaintiff's expert Mr. Watson admitted that prescribed burning did not occur on the reservation until after 1946. Defendant's expert Dr. Latham concurred that prescribed burning in the Southwest did not begin until 1947 or 1948. Accepting the witnesses' testimony (including that of Mr. Beaty) that prescribed burning was a forest management tool of questionable value, and assuming, *arguendo*, that one purpose for its use was to increase water yield, the date of its implementation remains an obstacle to any claim for government liability. Since prescribed burning was not introduced on the reservation until after the jurisdictional date of August 13, 1946, and since no liability for a continuing wrong was found on the remainder of plaintiff's fraudulent mismanagement claims, there is no Government liability for prescribed burning.

## C. *Claims for continuing wrong*

█ The conclusion that the Government did not overcut the Maverick area has an additional consequence for plaintiff's case. Since there was no Government wrongdoing involved in the Maverick sale, the Maverick sale and cut, which extended from 1946 through 1966, cannot form the basis for a continuing wrong. The notion of a continuing wrong, or wrongful conduct by the Government beginning before August 13, 1946, and continuing beyond that date, has particular importance for plaintiff's forest mismanagement claims because it forms the predicate for Government liability in plaintiff's claims for both post–1946 overcutting and fraudulent mismanagement of the forest for production of water. Both claims require a finding of continuing wrong to overcome the August 13, 1946 jurisdictional cutoff date for claims under the Indian Claims Commission Act. However, plaintiff was unable to prove overcutting on the Maverick sale area and failed even to offer any evidence of overcutting on any of the timber harvests that traversed the 1946 date.

Similarly, plaintiff's sole evidentiary basis for arguing that the continuing wrong is found in the BIA's 1942 Management Plan was Mr. Stowell's testimony that the plan set forth a "planned overcut" of the forest in violation of the 1934 statutory mandate of substained-yield management. Plaintiff neglected to explain what aspect of the plan indicated future overcutting. Examination of the document itself yields a contrary conclusion. The 1942 Management Plan estimates that merchantable stands will be cut at approximately 60 percent on the average—again, a figure previously testified to be prudent. It further touts the advantages to be gained from the

tion, on top of the mineral soil, typical of conifer forests in cool climates." Society of American Foresters, Forestry Terminology 27 (1958).

"light selection cutting of the North Fork and Horse Mesa units," which was already underway in 1942, and which the Plan contrasted with the earlier "clear cut with scattered seed trees" method of harvest on Unit One. There is simply no evidence in the record that would support a finding of continuing wrongful conduct in the development and implementation of the BIA's 1942 Management Plan.[28]

It should be noted that plaintiff devoted a considerable portion of its presentation to post–1946 timber harvests and management plans in an attempt to link all forest management events from before 1946 through the present. With the exception of the claims based on the Unit One cut and forest fires, all other liability theories premised on the existence of a continuing wrong have been rejected. Nevertheless, the issues involved in plaintiff's post–1946 overcutting claim should be briefly discussed.

Plaintiff attempted to construct a scenario of continuous overcutting of the forest after 1946. For the years 1946–1961, plaintiff alleged that the government-approved cuts exceeded both the sustained-yield growth and the AAC; and for the years since 1961, plaintiff claims only that the sustained-yield growth was exceeded. However, since the BIA did not establish AAC's until 1949 at the earliest, none of the cuts occurring between 1946 and 1949 could have exceeded the AAC.

Furthermore, despite its contention that harvests exceeded sustained-yield growth for all years since 1946, plaintiff's evidence does not show that the Government violated its sustained-yield management responsibilities after 1946. Rather, the evidence reveals a concerted effort by the Government, particularly after 1961, to measure past growth, predict future growth, and conduct timber sales in accordance with sustained-yield principles of silviculture. The BIA's 1985 Forest Management Plan includes calculations of the AAC for the East and West Zones of the forest. The AAC is the product of the anticipated net growth of the forest (based on a formula that combines "predicted" growth with growth "projected" from measurements of past growth), adjusted by the volume of timber required to be cut (East Zone) or added (West Zone) to achieve optimum stocking levels. Plaintiff's objections to the Government's level of cutting play out not so much as a dispute about whether the Government has based its principles of timber harvesting on sustained-yield growth, but rather as an argument over the accuracy of the Government's growth measurements and projections. Reduced to its essential elements, plaintiff's post–1946 overcutting claim seems more appropriately characterized as a disagreement about whether the sustained-yield growth figures used by the Government in planning timber cuts actually are being achieved by the forest.

Each party developed net growth figures from its own growth measurement plots— the Government, from its Continuous Forest Inventory ("CFI") plots which are remeasured every ten years, and plaintiff, from different survey plots established by Mr. Stowell and measured by Mr. Beaty in

---

28. It is not at all certain that the adoption before August 13, 1946, of a management plan to overcut the forest and the later implementation of cuts in accordance with the plan would be sufficient to constitute a continuing wrong. Unless the duration of the cut itself straddles the jurisdictional date, the accepted tenet under the continuing wrong doctrine that each discrete cut constitutes a separately actionable wrong, *see Mitchell v. United States*, 10 Cl.Ct. 63, 77, *modified on reh'g*, 10 Cl.Ct. 787, 789 (1986) (breach of obligation to regenerate), would appear to bar claims for overcutting that have as their only connection to pre–1946 conduct a management plan that may have contemplated the later cuts eventually made. The existence of a continuing wrong in such circumstances may well depend on a factual determination of how explicitly the management plan outlined the specific cut(s) and whether the cut(s) made actually conformed to to the plan. It is even less likely that a management plan by itself could form the basis of a continuing wrong, since the contemplated cuts are subject to change, and quite often are changed, at any time before their completion. For example, the 1954 Management Plan summarizes contract modifications to earlier cuts, demonstrating that planned cuts on the reservation were not a reliable forecast of actual cuts.

1985. Plaintiff accused the Government of overrepresenting high growth areas of the forest in its survey sites, thereby obtaining excessive and inaccurate growth rates. The Government contended that high growth areas were underrepresented in plaintiff's survey plots, yielding growth rates that are too low.

Leaving aside the fact that this overcutting claim is not a continuing wrong and the doubtful merit in characterizing mere differences of opinion over proper statistical methods as breaches of fiduciary duty, plaintiff has not convinced the court that its survey plots more accurately relfect the entire forest than do the Government's plots. The Government presented credible testimony by Mr. Mast that 1980 aerial photos of the reservation confirmed the representativeness of the Government's CFI plots. In particular, Mr. Mast stated that 58 percent of the CFI plots were located in "site 4" areas (sites with the highest growth rate) and that 56 percent of the forest's acres are of site 4 quality (as confirmed by aerial photos). Therefore, even if plaintiff had been able to establish a continuing wrong in the timber harvests that spanned the jurisdictional date of August 13, 1946, plaintiff has not proved that the Government conducted the post–1946 timber harvests in violation of its sustained-yield management duty, because plaintiff did not prove that its calculations of net growth were more reliable than the Government's calculations.

### D. *Damages for Unit One overcut*

The first issue to be addressed is the proper measure of damages for the overcutting on Unit One. Expert witnesses for both parties presented damages calculations. Mr. Beaty explained how plaintiff arrived at its damages sums; and Dr. Latham gave a critique of plaintiff's methodology and substituted figures and assumptions of his own in calculating the Government's damages sums. However, both parties' damage calculations were deficient to some extent, as will be explained. Because neither party has provided some of the calculations that are essential to an accurate assessment of damages and which should have been provided to the court, it will be necessary to supplement the damages calculations with informed approximations. This methodology will yield a final damages figure that resembles a "jury verdict." *See Branning v. United States,* 784 F.2d at 364; *Navajo Tribe of Indians,* 9 Cl.Ct. at 429, 439.

The first aspect of the Unit One damages in dispute is the acreage of forest overcut. Plaintiff asserted that all 52,480 acres of the Unit One sale were overcut. The Government demonstrated that the 28 percent of Unit One cut after 1932 was not overcut, and contained a significantly higher residual volume of timber, due to a change in cutting practices in approximately 1930. This conclusion would leave 72 percent of Unit One, or 37,786 acres, as the basis for calculating damages.

Plaintiff then calculated the additional growth that would have occurred on those acres from the midpoint of the Unit One cut (1928) until the beginning of the next anticipated cutting cycle (1978), had the area not been overcut. Plaintiff first calculated the additional amount that should have been left (519 BF per acre) by subtracting its estimate of the residual volume after cutting (1,700 BF per acre) [29] from a prudent residual volume (2,219 BF per acre). Plaintiff then applied a compound growth rate of 3.1 percent to the 519 BF per acre over the 50–year period. However, the Government's growth rate figure of 2.1 percent seems more reasonable. It is based on measured growth rates from plots on Unit One for years (1941–1951)

**29.** Plaintiff premised its residual volume figure on a weighted average of the entire Unit One area harvested. Although overcutting on Unit One was found to have occurred only on the acres cut through 1932, and defendant estimated the residual volume for the area cut through 1932 at 1,512 BF per acre, the court has used plaintiff's figure of 1,700 BF per acre in its damages calculations. The court accepts plaintiff's more modest residual volume figure in an attempt to balance its corresponding acceptance of plaintiff's "prudent residual volume" figure of 2,219 BF per acre—a number for which plaintiff offered little justification.

during the relevant time period for damages. By 1978 there would have been 1,467 BF of additional volume per acre. Multiplying this figure by a 1978 stumpage rate of $47 per thousand BF and by the 37,786 acres, yields a damages sum of $2,605,307.

Plaintiff's calculations must be faulted for their inclusion of anticipated mill profits, which they claim would have resulted from the availability and utilization of the timber from 50 years additional growth. Such speculative profits constitute an improper measure of damages and are not allowable. *See Nealy v. United States,* 152 Cl.Ct. 137, 146, 285 F.2d 438, 443 (1961).

The Government correctly notes that a deduction from the damages must be made for the present (1978) value of income that plaintiff originally received for the portion of excess timber cut from Unit One. This adjustment is necessary to avoid the partial double compensation that would result if plaintiff were allowed both to keep the original sale price of the excess timber cut and to be compensated later for the full value of the additional timber that would have existed in 1978, but for the earlier overcutting. Unfortunately, the Government offered neither a sum to subtract nor a method of calculating the portion of Unit One revenues attributable to the overcut timber. Dr. Latham merely contended that "the indicated damages become zero at any interest rate greater than 7.75% up to 1978." This assertion offers little guidance in the court's assessment of damages. Furthermore, the 7.75 percent interest rate to be applied to the original revenue over a 50–year period to obtain a present value is obviously historically inaccurate for the period 1928 to 1978. Nevertheless, some adjustment must be made.

Taking first a figure of 75 percent as the extent of the early (pre–1932) cutting on Unit One (as an approximation of the several conflicting and disparate figures offered by expert testimony) and subtracting what was offered by Mr. Beaty as a prudent cut level—65 percent—yield an approximate

overcut on Unit One of 10 percent. Applying this to the total revenue received from the Unit One sale through 1932 (approximately $1,250,000) yields a sum of $125,000 that can be attributed to the excess volume of timber harvested by 1932. By 1978 the present value of that sum, assuming a time-value interest rate averaging 4.0 percent compounded daily for the 50–year period, would have been $923,525. When this sum is subtracted from the gross damages figure of $2,605,307, the net damages for the Unit One overcutting total $1,681,782.

To reach a final damages award for plaintiff, the damages for the Army fuel wood ($57,500), the Army sawmill timber ($14,100), the agency sawmill timber ($33,-647), and the 1924 fires ($10,400) must be added. The Government is liable to plaintiff for a sum total of $1,797,429 in damages for its mismanagement of forest resources.

## CONCLUSION

It is found and concluded that (1) plaintiff failed to prove by a preponderance of evidence that defendant mismanaged the reservation's water resources and (2) that plaintiff is entitled to $5,424,429 for the Government's breaches of fiduciary duties in managing plaintiff's rangeland and forest resources. It is further found and concluded that plaintiff did not adduce evidence of any continuing wrong in respect of its water, rangeland, or forest resources.

Based on the foregoing,

IT IS ORDERED, as follows:

1. Plaintiff is awarded $5,424,429 for its claims for mismanagement of its resources.

2. If this amount is less than a timely offer of judgment for plaintiff's resource mismanagement claims that defendant served in writing in accordance with RUSCC 68, defendant shall file a copy of its offer by February 17, 1987, and a verified statement of costs incurred after defendant made the offer. If defendant made an offer with respect to all of plaintiff's claims in this docket, defendant shall not file its offer of judgment at this time.

3. If defendant makes the filing called for by ¶ 2, plaintiff shall show cause by March 2, 1987, why the award in ¶ 1 of this order shall not be reduced by the amount of defendant's costs.

4. Judgment on these claims shall not be entered until a judgment can enter on all the claims comprehended by Docket No. 22–H.